## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____
                                                    )
ACEBEDO & JOHNSON, LLC,                              )
IDL QUAD GROUP, LLC, and                             )
MEDICAL LEGAL CONSULTANTS                            )
OF GREATER ATLANTA, LLC, on behalf of                )
themselves and all others similarly situated,        )
                                                    )
      Plaintiffs,                               )
                                                    )    CIVIL ACTION
v.                                                  )
                                                    )    NO. _____
WORLDPAY US, INC.,                                  )
                                                    )
      Defendant.                                )
_____)

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs Acebedo & Johnson, LLC, IDL Quad Group, LLC, and Medical Legal Consultants of Greater Atlanta, LLC, individually and on behalf of the class of persons and entities preliminarily defined below, and complain and allege as follows, based on personal knowledge, investigation of counsel, and information and belief.

## INTRODUCTION

1.    For years, Defendant Worldpay US, Inc. has engaged in a multi-part scheme through which it fraudulently induces merchants to retain its card payment

processing services via uniform misrepresentations and omissions concerning the nature and amount of fees that customers will pay.  Then, once customers are locked into long term contracts, Defendant buries them with numerous unanticipated and excessive fees.  To make matters worse, Defendant deliberately obscures many of these upcharges in its intricate statements so that merchants cannot reasonably detect that they have been overbilled.

2.     Plaintiffs bring this action against Defendant to recover losses caused by this scheme.  Plaintiffs also challenge additional improper fees which breach Defendant's form contracts.

3.     This case is directly related to another case pending in this Court, *Alghadeer Bakery & Market, Inc. (on behalf of itself and all others similarly situated) v. WorldPay US, Inc.*, Civil Action File No. 1:16-cv-03627-MLB ("*Alghadeer*").  *Alghadeer* also concerns allegations of overbilling by WorldPay and indeed involves some of the same fees and practices at issue in this matter.

4.     Since the *Alghadeer* filing, Alghadeer's counsel has been contacted by dozens of WorldPay customers aggrieved by Defendant's billing practices.  Many of these WorldPay customers desired to assert their own claims against WorldPay. Plaintiffs are three such customers.

5. Plaintiffs began work on this pleading in the spring of 2017. Rather than filing a new case, however, counsel for Plaintiffs raised the issue of amending the *Alghadeer* case or filing a new case with defense counsel and the Court in *Alghadeer*. During a telephonic hearing in *Alghadeer* on June 9, 2017, Judge Totenberg indicated that she did not want these Plaintiffs added to *Alghadeer* at that time and advised WorldPay and the Plaintiffs to enter an agreement tolling any applicable statutes of limitations.

6. The parties thereafter reached such a tolling agreement, which was set to expire 15 days after any party served a termination notice, or the Court's resolution of WorldPay's motion for summary judgment, whichever occurred first.

7. *Alghadeer* was subsequently reassigned to Judge Michael L. Brown. On February 27, 2018, during a hearing on an unrelated issue, counsel for Plaintiffs apprised Judge Brown of the new Plaintiffs' claims and the potential need to file a new case asserting such claims. It was noted that discovery would be needed as to the claims of the additional customers and that, if WorldPay refused such discovery, the new Plaintiffs might need to join *Alghadeer* or file their own suit.

8. Based on information provided by WorldPay during the discovery process, it became clear that Plaintiffs' claims were by no means dependent upon

3

the outcome of WorldPay's motion for partial summary judgment in *Alghadeer* and in fact involve certain new fees, claims, and contracts not at issue in that case.

9.      Plaintiffs sought to thoroughly investigate such new issues in the *Alghadeer* case but WorldPay declined, indicating that it preferred to limit its ESI production to the issues directly raised by Plaintiff Alghadeer.

10.     In order to prevent needless delay, and because the tolling arrangement was no longer serving any purpose, the new Plaintiffs decided to proceed with their claims against WorldPay.   As a result, Plaintiffs notified WorldPay on May 16, 2018, that they were terminating the tolling agreement and would file their claims 15 days later in accordance with the agreement.

11.     This Class Action Complaint would have been filed on or before May 18, 2018, but for the term of the tolling agreement precluding such a filing for 15 days, which WorldPay has not agreed to waive.

## PAYMENT PROCESSING OVERVIEW

12.     In today's business world, most merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace.   In order to accept card payments, the merchant must utilize a payment processing service.  As used throughout this Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit

4

or debit cards for payments. This includes non-profits, schools, churches, government agencies, and many persons or entities that are not traditional businesses. All are subject to the same improper treatment by Defendant.

13.     Merchants like Plaintiffs rely on companies like Defendant to provide this critical payment processing service in accordance with fair and transparent terms. Indeed, for many merchants, fees for card processing services are likely to be the third highest expense following labor and product costs. Even for a very small business, these fees can easily exceed $100 per month.

14.     The card processing system can be extremely difficult to understand, with many involved parties. For instance, in addition to the merchant which receives payment, and the customer who provides such payment, the processing of a card transaction involves several other parties:

        (a).     The Card Issuer – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which receives a fee whenever a customer uses one its cards for a transaction. These companies receive fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction). There are hundreds of different card types and the fee varies based on the type of card used. For example, rewards credit cards command a higher fee than a card with no

rewards program.  The fees paid to the issuing banks are generally known as "interchange fees."

(b).  The Card Payment Network – the card networks (i.e., Visa, MasterCard, and Discover) establish and publish interchange fees applicable to each type of card in their system.  The card networks charge additional per transaction fees, such as access fees.  By way of example, Visa assesses an access fee known as the "APF" ("Acquirer Processing Fee"), which is currently $0.0195 per credit card transaction and $0.0155 per debit card transaction, and MasterCard charges an access fee known as the "NABU" ("Network Access Brand Usage") fee, which is currently $0.0195 for any card transaction.  The card networks also charge additional fees that are generally known as "assessments."  The fees established by the card networks (like the interchange fees) apply universally and are not subject to negotiation no matter who the customer, merchant, or processor is.  No entity aside from the card networks has the authority to modify these fees.

(c).  The Payment Processor – this is the entity that processes the payment and ensures that whenever a merchant receives payment for an item or service with a credit or debit card, (i) the customer's card account is debited and the merchant's bank account is credited, (ii) the merchant is assessed all applicable fees, and (iii) such fees are distributed to the proper parties.  Defendant is a

payment processor.

(d).   The Member Bank – only banks such as RBS Citizens and Wells Fargo may be members of card networks.  These member banks "sponsor" payment processors so they may process transactions through the card networks.

(e).   The Merchant Acquirer – this is the company that markets the payment processor's services to merchants.  Merchant acquirers essentially act as a "middle man" between merchants and payment processors.  They enroll merchants in payment processing services and usually provide customer support to the merchant, such as sending monthly statements showing all credits and debits.  Merchant acquirers usually enter into agency agreements with independent agents or companies, sometimes known as Independent Sales Organizations (ISOs) or Member Service Providers (MSPs), which sign up merchants.  The merchant acquirer then pays the ISO/MSP based on a percentage of the processing fees obtained from "their" merchants.  Defendant is a merchant acquirer but also signs up merchants directly, and so qualifies as an ISO/MSP as well.

15.     The number of involved parties and moving pieces can make it difficult for merchants to forecast their expenses for card processing services.  For instance, it is virtually impossible for merchants to determine which charges are legitimate "pass through" payment network fees and which charges are added

solely by the processor.   Merchants thus rely on companies like Defendant to disclose on the front end of their relationship the nature and amount of fees they will be charged.   Indeed, such front-end disclosure and clarity is critical because payment processing contracts are typically long-term deals that are cancellable only with hefty early termination penalties.

16.     Unfortunately, Defendant's business plan has long been to exploit its position of knowledge and power in an inherently confusing industry to defraud and overcharge merchants.   Defendant and its ISO/MSP agents induce merchants like Plaintiffs to execute standardized agreements that prominently disclose straightforward fees as an inducement to enter into business with Defendant. However, all the while, Defendant knows that the merchant is going to be flooded with additional charges that either were intentionally never disclosed or mischaracterized in the standardized agreements.

17.     Defendant aggressively perpetrates this scheme.   Its standardized contracts intentionally misrepresent, omit, and/or conceal key facts concerning the fees and rates it knows it will eventually charge merchants if they sign on the dotted line.

18.     Defendant engages in this fraud to induce merchants to do business with Defendant.   Indeed, Defendant knows full well that if merchants knew the

true nature and extent of the fees they would eventually be charged, they would not agree to do business with Defendant.

19.     After inducing merchants to bind themselves to the standardized contract, Defendant then systematically crams merchants with undisclosed and unanticipated fees.   Making matters worse, Defendant's form statements mischaracterize some of the upcharges as being proper "pass through" fees imposed by the payment networks, even though they are secretly inflated by WorldPay.  Such activity prohibits merchants from reasonably detecting that they have been improperly charged.

20.     These improper fees are assessed for the sole purpose of raising additional revenue for Defendant at merchant expense.  It is a classic case of cheating the customer that, due to the lack of regulation in the payment processing industry and the relatively small sums of money at stake for any individual merchant, almost always goes unchallenged.

21.     Throughout the class period, Defendant has perpetrated this scheme to generate hundreds of millions of dollars from over 200,000 merchants.  This case challenges the nature and amount of Defendant's upcharges on behalf of Plaintiffs and the below defined class, and seeks rescission, monetary damages, restitution, declaratory relief, and injunctive relief.

## PARTIES

22.    Plaintiff Acebedo & Johnson, LLC ("Acebedo") is a Washington limited liability company that operates as a civil law firm in Puyallup, Washington. Acebedo was a customer of Defendant from March 2010 through December 2016 and had two processing accounts with WorldPay during this time, one for general fee payments and one for IOLTA payments.

23.    Plaintiff IDL Quad Group, LLC ("IDL Quad") is an Oklahoma limited liability company that operates a ballroom in Tulsa which is used for parties, concerts, and receptions.  IDL Quad had a payment processing account with Defendant from June 2010 through October 2016.

24.    Plaintiff Medical Legal Consultants of Greater Atlanta, LLC ("MLC") is an empowerment, prosperity, and mental health coaching practice run by Dr. David Wright that helps individuals cope with cognitive dilemmas, emotional challenges, and psychological stresses in holistic and healthy ways.  MLC was a WorldPay customer from September 2016 until it terminated WorldPay's services in early 2017.

25.    Defendant WorldPay US, Inc. ("WorldPay") is the United States subsidiary of WorldPay, Inc. (NYSE: WP; LSE: WPY), a Delaware corporation that was formed in January 2018 when the leading merchant acquirer in the United

States (Vantiv, Inc.) acquired the leading merchant acquirer in the United Kingdom (Worldpay Group PLC) for $10.4 billion.  This price equates to well over $10,000 per customer.

26.    Worldpay Group PLC owned the U.S. payment processor and merchant acquirer known as WorldPay US, Inc.  WorldPay, which formerly did business under the names "RBS Lynk Incorporated" and "RBS WorldPay, Inc.," is a Georgia corporation with its principal place of business at 201 17th Street NW, Suite 1000, Atlanta, Georgia, 30363.  WorldPay offers "in-store, online and mobile payment acceptance solutions for U.S.-based customers, with a focus on developing omni-commerce and integrated payment solutions for its approximately 100,000 customers."  If service is not waived, WorldPay may be served through its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

## JURISDICTION AND VENUE

27.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than Georgia.

28.     This Court has personal jurisdiction over Defendant because it is a Georgia business within this judicial district.  Indeed, WorldPay's headquarters are located in Atlanta.  As such, it has significant, continuous, and pervasive contacts in Georgia.

29.     Venue lies within this judicial district because Defendant mandates that suits against it be filed in "the courts of Atlanta, Georgia or Fulton County, Georgia," both of which fall entirely within this district.

## COMMON FACTUAL ALLEGATIONS

**A.     WorldPay's     Pre-Contractual     Pricing     Misrepresentations     and Omissions.**

30.     WorldPay markets its payment processing services to merchants through itself and its ISO/MSP-agents.  Its goal is to induce merchants to switch to WorldPay from their current card processor through promises of transparent, low cost pricing.

31.     Merchants are attracted by promises of being able to save money by reducing the costs they will pay for payment processing services if they switch providers.   This approach is very appealing to merchants because payment processing is a substantial business expense.

32.     WorldPay presents merchants with its form Customer Processing Agreement ("Agreement").  This Agreement sets forth, in a clear and conspicuous

12

manner, both the pricing model to which merchants will be subject if they process card payments through WorldPay and, importantly, the specific rates and fees they will pay.  Plaintiffs' Agreements are attached hereto as Exhibits A through C.

33.    WorldPay offers two main pricing models.  The first is "cost plus" pricing.  Under this model, which is also known in the industry as "interchange plus," merchants agree to pay the standard fees established by the card networks *plus* an agreed mark-up for Defendant.

34.    In other words, WorldPay and the merchant agree to WorldPay's processing fee and then the standard fees and rates charged by the card networks for each transaction are passed through to the merchant and added to WorldPay's fee. *See* IDL Quad Agreement, p. 2 ("Merchants are responsible for the percentage and/or transaction fee listed here plus any card issuer costs involved") (Exh. B); MLC Agreement, p. 2 ("All standard Payment Network fees and charges will be added to the fees below") (Exh. C).

35.    Cost plus pricing is widely regarded as the best pricing model for merchants.  Indeed, as one industry publication states, this model

> is the most transparent, cost-effective form of merchant account pricing. The separation of processing costs with [cost plus] also allows for the optimization of interchange expenses . . . . By passing interchange fees directly to merchants with a fixed markup, surcharges and hidden costs are generally eliminated.

13

*See* http://www.cardfellow.com/blog/interchange-plus-pricing/.

36.     Plaintiffs IDL Quad and MLC were enrolled in the cost plus pricing model.  *See* IDL Quad Agreement, p. 2; MLC Agreement, p. 2.

37.     The second pricing model offered by WorldPay is tiered pricing.  This model establishes several pricing "tiers" and works on a system of "qualification" to determine which tier a particular transaction falls into.  For example, if a given transaction qualifies for "Tier 1," it will pay a rate agreed-to by the merchant and the processor.  If the transaction fails to qualify at "Tier 1" but qualifies at "Tier 2," the merchant will pay the Tier 1 rate plus an additional agreed surcharge.  If the transaction fails to qualify at either Tier 1 or Tier 2, the merchant will pay an even higher surcharge for Tier 3 transactions.  And if the transaction fails to qualify at either Tier 1, Tier 2, or Tier 3, the merchant will pay an even higher surcharge.

38.     Tiered pricing is reviled in the industry because transactions frequently "downgrade" to a higher tier.  The reasons a transaction may downgrade are unknown to merchants, within the discretion of processors, merchant acquirers, and member banks, and are often changed without notice.  Many of these qualification criteria are outside the merchant's control, most notably the type of card used by the merchant's customer for the transaction.

39.     Plaintiff Acebedo was enrolled in a tiered pricing model.   *See* Acebedo Agreement, p. 2 (Exh. A hereto).

40.     In addition to establishing the applicable pricing model and setting forth the specific processing fees, the Customer Processing Agreement also discloses in plain terms additional recurring fees that merchants can expect to pay if they do business with WorldPay.   *See* Acebedo Agreement, p. 3; IDL Quad Agreement, p. 3; MLC Agreement, p. 2.

41.     Some of these recurring fees are only applicable to some merchants. For example, IDL Quad Group agreed to pay a "Minimum Processing" fee of $25.00 per month.   IDL Quad Agreement, p. 3.   Acebedo and MLC, on the other hand, negotiated deals that did not include such a fee.   Acebedo Agreement, p. 3 (identifying "Minimum Processing" fee of $0/month); MLC Agreement, p. 2 (same).

42.     Notably, WorldPay's standard Agreements do not disclose any type of annual fee.   *See* Exhs. A – C.

43.     The Agreement thus informs the merchant of the pricing model and the fees and rates the merchant will be charged if it agrees to enroll with Defendant.   There is no indication on the face of the Agreement that the disclosed

rates and fees can or will change throughout the term.  For instance, there is no disclosure the listed pricing is only "introductory" or "promotional."

44.     Merchants that are satisfied with the pricing terms noted on the Agreement sign it.  Merchants are led to believe, and justifiably believe, the disclosed rates and fees are what they will pay throughout the term.  Such rates and fees induce merchants to do business with Defendant.

45.     WorldPay, however, has never had any intention of charging the merchant only those fees and rates set forth in the Agreement.  Defendant at all times knew full well that these rates and fees would be increased and new recurring fees would invariably be added once merchants sign on the dotted line and bind themselves to the Agreement's lengthy term (often three years, with automatic one year renewals).

46.     In fact, the fees and rates disclosed in the Agreement – i.e., the pricing that induces the merchant to do business with Defendant – in actuality comprise only some of the charges that are imposed once a merchant starts to do business with Defendant.  A few examples of these planned fee manipulations are detailed below.

47.     *Undisclosed Annual Fees.*  Defendant's form Agreement fails to disclose that a merchant will pay any type of annual fee.  *See generally* Exhs. A –

C.  Defendant intentionally fails to disclose annual fees on its Agreement because merchants loathe such "junk fees" and if they knew they would be charged such fees, they would not agree to do business with Defendant or would negotiate on the front end to have the fees stricken from the Agreement.

48.     Despite the lack of disclosure of such fees, Defendant has always intended to charge its small and medium-sized customers annual fees.  Over the years, Defendant has used different names for such fees (e.g., "1099k IRS Report Fee," "Annual Fee," "Annual Compliance Services Fee," etc.) but they are typically between $100 and $200 per year and are often charged during the September and December billing periods.  Such a fee, that often equates to over $10 per month, is material to most merchants and they would not have knowingly agreed to it.

49.     _Other Undisclosed Recurring Fees._  In addition to annual fees, WorldPay's Agreement also fails to specifically disclose numerous other recurring fees that WorldPay always planned to charge.

50.     For example, for many years WorldPay's form Agreements failed to disclose that merchants would pay a monthly fee for its PCI program.  "PCI" stands for "Payment Card Industry" and purportedly relates to security standards established by the Payment Card Industry Security Standards Council.  WorldPay

17

imposes such a fee on nearly all of its small and medium sized merchants, often at a rate of $12.95 per month.  This fee is charged to merchants regardless of whether they use the PCI program and thus is in direct contravention of the Agreement's representations that "FEES APPLY ONLY TO SERVICES USED."  *See* Acebedo Agreement, p. 1; IDL Quad Agreement, p. 1.

51.     For years, this fee was not disclosed on WorldPay's form Agreements even though WorldPay knew it would eventually be imposed on merchants.  In more recent versions of the Agreement, there is a space for a monthly or quarterly "PCI Program" fee but it is often left blank or scratched through, indicating to merchants that it will not be charged.  *E.g.*, MLC Agreement, p. 2.  The existence and amount of this fee is material to most merchants.

52.     WorldPay's form Agreements also do not inform merchants that they will pay large monthly fees whenever they are deemed by WorldPay to be PCI ***non***-compliant.  Nonetheless, WorldPay imposes such a fee on most of its small and medium-sized customers.  Such fees often start at $19.99 per month and increase substantially over time, occasionally to as high as $65.00 per month.

53.     These unexpected junk fees are sufficient to make a sizeable dent in merchants' bottom lines.  They most certainly would have been material to

merchants in making their decision about whether to do business with WorldPay, that is if had they been disclosed at the outset of the relationship.

54.     _Minimum Processing Fees._  By way of another example, Defendant's form Agreement discloses a recurring minimum processing fee, which guarantees Defendant a certain amount of fees per month even during the months when the merchant does not use (or minimally uses) Defendant's services.  Again, this is an important part of the deal for merchants because no merchant ever wants to pay high fees during months when they do not use processing services.  But Defendant never had any intent to charge only the minimum processing fee set forth in the Agreement.

55.     After merchants enroll, Defendant often increases this fee, for example from $0 per month to $35 per month, so as to ensure the merchant pays more (and Defendant profits more) each month.  These unexpected charges are material to merchants and would have affected their decision to do business with Defendant if properly disclosed.

56.     _Charging Payment Network Fees to Tiered Pricing Customers._  By way of another example, WorldPay imposes payment network fees on merchants that are **not** on cost plus pricing plans, but rather are on tiered pricing plans, in which there is no basis or rationale for such fees.

19

57.     One of the few benefits to merchants in tiered pricing plans is that they need not pay the standard payment network fees *in addition to* the agreed-upon tiered processing fees.  This is because their high tiered rates already account for all such payment network fees.  Nonetheless, Defendant often improperly adds payment network fees to tiered pricing customers (e.g., Visa fixed acquirer network fees, annual MasterCard participation fees, etc.).

58.     *Inflating Payment Network Fees Above Pass Through Cost.*   The Agreement is clear for cost plus customers that payment network fees (which include access fees) will be passed through at cost.  That is the entire point of the cost plus pricing model.

59.     For example, the access fees actually charged by the payment networks at the relevant time periods are as follows:  (i) prior to July 2012, all Visa transactions incurred an APF fee of $0.0195; (ii) from July 2012 to the present, Visa credit transactions continued to incur an APF fee of $0.0195; (iii) from July 2012 to the present, Visa debit transactions incurred an APF fee of $0.0155; (iv) prior to June 2013, all MasterCard transactions incurred a NABU fee of $0.0185; (v) from July 2013 to the present, all MasterCard transactions incurred a NABU fee of $0.0195; (vi) prior to April 2016, all Discover transactions incurred an

access fee of $0.0185; and (vii) from April 2016 to the present, all Discover transactions incur an access fee of $0.0195.

60.     WorldPay, however, has never had any intention to pass through these access fees to its merchants at these costs.  Instead, WorldPay has systematically inflated these fees.  For example, WorldPay might charge a customer access fees of $0.0249 for each MasterCard transaction, $0.0270 for each Discover transaction, and $0.0246 for each Visa transaction (regardless of whether it is a credit or debit transaction).  Although each overcharge is less than a penny, for some merchants this adds up to a substantial amount each month.  For example, a restaurant that averages 100 card transactions each day would have been overcharged over $15 each month.

61.     An additional example of payment network fee manipulations is Defendant's inflation of Visa's fixed acquirer network fees, which are often charged at a rate of $4.25/month even when Visa's actual fixed acquirer network fees are much lower.

62.      Of course, WorldPay does not inform merchants that it is inflating these payment network fees, but rather attributes the amounts on its monthly statements to the payment networks, referring to them as "Access fee for Visa transactions," "Access fee for MasterCard transactions," and "Access fee for

21

Discover transactions." That way, cost plus merchants are lulled into believing the inflated amounts are established by the identified payment networks and are being passed through at cost, as the contract requires.

63.    *Increases to Processing Rates.*  Rather than stick to its commitments to charge the processing rates prominently disclosed in the Agreement, WorldPay often inflates these rates over the term of the Agreement.

64.    For tiered pricing customers, WorldPay often increases the discount rates and per item fees for one or more tiers.  For instance, WorldPay might bump the agreed Tier 1 rate from 1.49% to 1.57% and the per item fee on Tier 4 transactions from $0.25 to $0.30 per transaction.

65.    These may seem like minor increases but, once again, given that they are on a per transaction level and even a very small business can process several hundred transactions per month, they are significant.

66.    Defendant's whole business model is built on such pricing misrepresentations.  Indeed, throughout the relevant period while WorldPay was promising prospective merchants that they would be charged the rates and fees set forth in their Agreements, Defendant was charging much more to existing customers.  WorldPay knew it would eventually charge all prospective customers the higher, unidentified fees if they signed up.

67.     WorldPay knows full well that if merchants were apprised of WorldPay's true billing practices, they would never enroll in WorldPay's services. For example, no reasonable merchant would bind itself to a lengthy contract term containing huge early termination penalties if it knew the disclosed fees and rates were merely "introductory" or "initial" rates and would be massively increased. That is a lose-lose situation for merchants as they would either be bound to pay the early termination fee or the undisclosed increases.

68.     Small business owners have posted innumerable independent reports of Defendant's pricing bait-and-switch.   For example, one business posted this complaint on a small business website in February 2018:

> WARNING!!!  This company is terrible never do business with them. They are unethical and scam artists. They add on a ton of fees that are not in your contract.

Another merchant posted this in January 2018:

> This company is unbelievable!!! What a scam.  They charge you a new fee [every] time you look at your statement!!!
>
> THIS COMPANY IS A RIP OFF!!!!!!

And another from January 2017:

> I usually do not put companies on blast but this is necessary.  If you are ever considering using WorldPay as a merchant services provider, do not.  Their billing practices are deplorable. . . .

Within the past year WorldPay has consistently over billed us for several months. It took several calls only to have their reps dishonestly advise us that the overbilling will not reoccur. Instead, I would receive the same erroneous billing the following month (after the rep advised us it was removed from our account). And these are bills that are automatically withdrawn. So for example, if you or overbilled by several thousands of dollars, this is automatically deducted from your bottom line. You then have to catch the error, and the resolve it after the fact hoping the funds will be returned to you.

Which brings me to today. Our contract with them is one that does not contain annual fees for the duration of the agreement. I recently [] discovered that an annual fee was applied. A fee that is not part of the terms of my agreement. When we called them they said they introduced the fee this year. . . .

Their predatory billing practices on small business is tantamount to theft. Not only do they refuse to reverse fraudulent charges that are not part of the terms of our agreement, they also refuse to cover additional fees incurred by our financial institution. Folks, this is not how business is done.

And another from January 2017:

They are horrible!!! When [I] start[ed] with them they said no annual fee, no charges unless being used. I end up not using the services. They end up charging me 170 annual fee. When [I] asked them why they charge annual fee when they said they wouldn[']t, they said they send me an email, which [I] didn[']t receive, and didn[']t get a response from me so that gives them the right to autowithdraw $170 from my bank account. This is outrageous. This is unauthorized autodrafting from my account. Do not sign up with them or you will regret it.

Yet another similar complaint was posted in June 2016:

> I only gave one star because that[']s the only option.  They deserve zero stars.  What everyone else says is correct.  Fraudulent charges and misrepresentation of contract is what I experienced as well. Customer service does not pick up the phone either.

69.     The Better Business Bureau has also fielded innumerable complaints from WorldPay customers.   For example, a business lodged this complaint in January 2018:

> I signed up for Worldpay and was never told about several things like being compliant or non compliant so for two years I've been non compliant [and] have been charged [] 69.00 a month never got a notice in the mail no phone calls telling me compliant. I am a small business if I had been told about the charges I would receiving never would I have signed up! There was also a fee of 179.00 a year so I've been paying 98.00 a month[.]  [C]harges of 292.40 in Jan of 2018 w[ere] taken out of my bank account which I didn't have enough funds for so I had 6 overdraft charges. Ive been in business for 24 years and how embarrassing this has been for me[.]  [A]ll I would like [is] to be out of my contract and it's not up for 13 months[.]  I have to pay another 199.99 and that's not right.   This company was not forthcoming in the sale of this product!

Another business posted this in June 2017:

> Incorrect Contract Charges Monthly, always higher than what I was contracted for.  When I initially signed this contract with World Pay, there was no yearly fee, only a monthly fee of $14.95 a month, with an additional percentage IF I used the device. The beginning of 2016 they charged a yearly fee, after a few months of contact with them they finally refunded the fee.  In January 2017, they charged another yearly fee of $169.99 which I again, called to dispute because per my contract, I was told there was no yearly fee, just a monthly fee of $14.95. . . . When they charged the $169.99 yearly fee in January, it overdrew my bank account, and the fees my bank charged plus their fees put my account in almost -$400.00.  Eventually in March that

25

was rectified and the funds were put back into my account by both Citizens Bank and World Pay, but now this month again, when there should have been only $14.95 charged, I was charged $45.78 overdrawing my account now again because they took more than what is in my contract. My account is currently sitting at -$77.12 because of fees being charged because they charged more than the contract. I use this for a small business where in an entire YEAR I use the device to charge less than $100. So as it was, I was paying more in monthly fees than I was bringing in . . .

And yet another from January 2017:

I have a contract with Worldpay to process my credit card payments. In the contract there are percentage fees and monthly fees that are paid. [O]n January 6 they charged me a significantly higher rate. After days trying to get a hold of someone I finally got a person to answer the phone and I asked them why was the fee so high[.] [T]hey told me it was the annual service fee. I was never told about this by the sales person which I have all the emails as proof and also it is not stated in the contract that I also have. This is an illegal and unethical way to conduct business. I did not agree to that!

70.    These are not outliers but are representative of many other complaints by WorldPay's customers.

**B.    The Adhesive Terms.**

71.    In tiny, barely legible print on the last page, the Agreement references a separate document, the "Terms and Conditions of Customer Processing Agreement" (hereinafter, "Terms"). *E.g.*, Acebedo Agreement, p. 4; MLC Agreement, p. 4.

26

72.    The Terms are a boilerplate form that is not negotiable.  *E.g.*, Acebedo Agreement, p. 4 (barring "oral or written modifications" to the Terms).  The Terms consist of small, non-descript font occupying several pages and containing more than 60 separate paragraphs.  *E.g.*, Acebedo Terms (Exh. D hereto); MLC Terms (Exh. E hereto).[1]

73.    Boiled down to their core, the Terms represent a unilateral effort by WorldPay to (a) backtrack from the pricing that is negotiated by the parties and set forth in the Agreement and (b) immunize Defendant from liability for its overbilling practices.

74.    WorldPay revises the terms periodically such that new customers are subject to different versions of the Terms than older customers.  While many of the provisions of the Terms have stayed materially the same throughout the putative class period, certain terms have changed significantly.  *Compare, e.g.*, Acebedo Terms *with* MLC Terms.  Discovery is needed to determine which (and how many) putative class members are subject to the various versions of the Terms.

---

[1] IDL Quad has been unable to locate a copy of the Terms applicable to its account in its files.  WorldPay has produced the version of the Terms it contends is applicable to IDL's Quad's account that is materially similar to Acebedo's Terms but this version has no markings to indicate that it is truly the applicable Terms (such as a date or version number that matches IDL Quad's Agreement).  Further discovery on this issue is needed.

75.     Despite WorldPay's best efforts, the Terms do not actually authorize or condone WorldPay's fee manipulations.  *See, e.g.*, ¶¶ 153-183, *infra*.  Moreover, several key provisions in the Terms violate public policy, lack mutuality, are unconscionable, constitute improper exculpatory clauses, and are otherwise void and unenforceable under applicable Georgia law.  *Id.*

**C.    Defendant Crams Merchants With Excessive and Undisclosed Fees.**

76.     Once the contract is executed by merchants, Defendant repeatedly crams them with rates and fees that are higher than those set forth in the Agreement and additional fees that were not even mentioned in the Agreement, including but not limited to (a) annual fees, (b) monthly or quarterly fees for the PCI program, (c) fees for PCI non-validation/non-compliance, (d) increased minimum processing fees, (e) categorically improper pass through fees, (f) inflated pass through fees, and (g) excessive processing fees and rates.

77.     These activities are not random or the result of sporadic errors. Rather, they are imposed by Defendant in an automated fashion to carry out its scheme of maximizing profit at merchant expense.

78.     Notably, although all versions of the Terms require it, Defendant does not provide advance notice of many of the new or increased fees.  For example,

Defendant does not provide advance notice of its inflation of payment network costs (including access fees).

79.     The advance notices that Defendant does provide of certain new or increased fees are often not compliant with the Terms and are thus ineffective.  For example, many versions of the Terms require WorldPay to send notice via U.S. Mail (e.g., Acebedo Terms, ¶ 11.6); however, WorldPay often attempted to communicate notice via other means (such as via email or through its internet portal).

80.     Moreover, the advance notices sometimes use inapposite terminology (i.e., qualified, mid-qualified, non-qualified) that is different from that used in the Agreement and on prior statements (i.e., Tier 2, Tier 3, and Tier 4), such that merchants have no reasonable basis for understanding the notices.

81.     Finally, WorldPay does not provide notice that fees have been deducted from merchant accounts until after they are already gone.  The statements provided by Defendant are not bills and need not be voluntarily paid by merchants. Rather, statements are created and made available for merchant review after the fees have already been seized by Defendant.  Thus, merchants lack a mechanism to dispute fees before WorldPay has already deducted them from the account.

82.     Making matters worse, Defendant formats its monthly statements in a manner designed to confuse and confound merchants, obscure and hide its overcharges, and falsely attribute the inflated amounts to payment networks so that merchants cannot reasonably detect that they have been improperly charged by WorldPay.

83.     Those merchants that subsequently notice and complain about the overcharges are simply routed into an endless loop of automated messages and holding the line in Defendant's so-called customer service system.  The end result for most merchants is that the only way out of paying the improper fees is to pay an extortionate early termination fee, which can sometimes exceed $495.

84.     This case challenges all improper fees imposed by Defendant, whether the result of fraudulently induced contracts or overcharges that violate the contract.

85.     Shockingly, Defendant has been able to keep its schemes going for years.  Payment processing is largely unregulated, so no governmental agency is directly charged with overseeing WorldPay.  The industry has been called "the wild, wild west."

86.     A complete description of Defendant's bad practices would run to hundreds of pages.  Far lesser misdeeds have led to the federal criminal prosecution of one of Defendant's competitors.

87.     On May 2, 2017, two individual agents of Commerce Payment Group were indicted on mail and wire fraud.  *See* Indictment in Case No. 17-CRIM-248 (S.D.N.Y.) ("Indictment").  The agents stand accused of committing mail and wire fraud and conspiracy to commit mail and wire fraud by engaging in behaviors that are eerily similar to WorldPay's conduct.  For instance, the agents allegedly

(a).    advertised low payment processing fees with no annual fees despite knowledge that that the payment processing fees would be higher and annual fees would, in fact, be charged (*compare* Indictment, ¶¶ 16(a), 19(b), 23 *with* ¶¶ 47-48, *supra*);

(b).    charged merchants fees that were higher than those identified in the merchant agreements, such as higher rates and per transaction fees, PCI fees, and inflated pass through charges (*compare* Indictment, ¶¶ 31(a), (c)-(g) *with* ¶¶ 49-65, *supra*);

(c).    "arbitrarily and periodically increase[ed] these fees and others, when [the agents] wished to generate additional revenue" (*compare* Indictment, ¶ 31(i) *with* ¶¶ 182-183, *infra*); and

(d).    falsely informed merchants that fee increases were caused by third parties even then they were not (*compare* Indictment, ¶ 32(b) *with* ¶ 62, *supra*, and ¶ 122, *infra*).

88.     Defendant's conduct is similarly egregious to the actions deemed criminal violations in the Commerce Payment Group indictment.

## INDIVIDUAL FACTUAL ALLEGATIONS

### A.     Acebedo & Johnson, LLC.

89.     Plaintiff Acebedo enrolled in WorldPay's services through a seemingly reputable sales agent – Dave Duseck of WorldPay ISO/MSP Century Payments – in March of 2010.

90.     Acebedo opened two accounts with WorldPay, one for IOLTA payments and one for ordinary fee payments.  "IOLTA" stands for "Interest on Lawyers Trust Accounts" and is a specific type of account for attorney escrow or trust accounts.   The IOLTA account ended in x0375, while the ordinary fee payment account ended in x0367.   Both accounts were subject to the same Agreement.

91.     Acebedo was induced to contract based on the Agreement's fraudulent misrepresentations concerning fees.  Acebedo agreed to a tiered pricing program whereby it would pay 1.49% and $0.25 for each Tier 1 transaction, an additional surcharge of .40% and $0.25 for each Tier 2 transaction, an additional surcharge of .80% and $0.25 for each Tier 3 transaction, and an additional

surcharge of 1.60% and $0.25 for each Tier 4 transaction.  *See* Acebedo Agreement, p. 2.

92.     Acebedo also agreed to specified recurring fees disclosed in Agreement, including a $9 monthly administrative fee.  *Id.* at 3.

93.     Acebedo did not agree to pay a minimum processing fee, as this fee was set as $0.  Additionally, there was no annual fee, PCI program fee, or PCI non-validation/non-compliance fees specified in the Agreement, thus Acebedo did not expect to pay these fees.  *Id.*

94.     At no time before they signed the Agreement were Acebedo principals Pierre Acebedo or Cindy Johnson advised that these identified rates and fees would be increased or previously unspecified fees would be added.  Had they known that Defendant intended to charge much higher rates and fees, they would not have signed the Agreement.

95.     During many months while it was a customer, Acebedo was overcharged by Defendant on both of its accounts in violation of the contractual terms that were entered (based only on Defendant's fraud and misrepresentations).

96.     For example, WorldPay made across-the-board increases to the tiered rates charged to Acebedo for processing credit and debit card transactions.  Indeed, during Acebedo's time as a customer, WorldPay increased the Tier 1 rate by 8

basis points (.08%), the Tier 2 rate by 18 basis points (.18%), the Tier 3 rate by 18 basis points (.18%), and the Tier 4 rate by 23 basis points (.23%).  WorldPay also increased the Tier 4 per item fee from $0.25 to $0.30.  These increases, many of which were imposed in the last six years, resulted in Acebedo paying hundreds of dollars more than it would have paid had WorldPay honored the negotiated pricing.

97.     WorldPay has also passed through certain card network fees to Acebedo even though it was not a cost plus customer and was not contractually obligated to pay such fees.

98.     For example, in April 2012 and for every month thereafter while it was a customer, Defendant charged Acebedo a monthly fee of $4.25 on each account for Visa's fixed acquirer network cost.  In addition to being categorically improper, the $4.25 amount is greater than the actual fixed acquirer network cost that Visa assessed for the Acebedo accounts.  Upon information and belief, such amount was actually $2.00 per account, resulting in overcharges in excess of $200.

99.     Moreover, during several months Defendant charged Acebedo MasterCard location fees (e.g., the $1.25 per month fees charged in 2017).  As a tiered pricing customer, Acebedo did not agree to pay such additional payment network fees.

34

100.     WorldPay also charged each Acebedo account annual fees every year from 2011 through 2016.  These fees were either called "1099k IRS Report Fee" (imposed September 2011) or "Annual Fee" (imposed September 2012, September 2013, September 2014, December 2015, and December 2016) and ranged in amount from a low of $89.00 to a high of $159.00.  All told, despite no annual fees being mentioned in the Agreement, WorldPay wrongfully seized more than $1,300 in annual fees from Acebedo's accounts.

101.     Starting in July 2011, WorldPay deducted a monthly fee of $12.95 from each of Acebedo's accounts for enrollment in WorldPay's PCI program.  This is despite the fact that the Agreement fails to mention such a fee and Acebedo never requested that it be enrolled in the program.  All told, WorldPay wrongfully seized more than $1,800 in PCI program fees from Acebedo's accounts.  These amounts went straight to WorldPay's bottom line; WorldPay had no actual costs attributable to Acebedo's purported enrollment.

102.     Starting in May 2013, WorldPay deducted a monthly fee from each of Acebedo's accounts for PCI non-validation/non-compliance.  This is despite the fact that the Agreement fails to mention such a fee.  The monthly fee began at $19.99 per month and was subsequently increased by WorldPay, initially to $39.99 per month (starting September 2015), and eventually to a whopping $65.00 per

month (April 2017). All told, WorldPay wrongfully seized more than $3,000 in PCI Non-validation/Non-compliance fees from Acebedo's accounts. Once again, these amounts went straight to WorldPay's bottom line; WorldPay had no actual costs attributable to this fee.

103. While it was a customer, and on several occasions within the last six years, WorldPay imposed minimum processing fees of $35.00 (or the applicable fraction thereof) on Acebedo. This is despite the fact that Acebedo negotiated a contract with a $0 minimum processing fee. These particular unauthorized fees cost Acebedo several hundred dollars.

104. Acebedo became alerted to WorldPay's overbilling scheme in late 2016. Via letter dated November 22, 2016, and mailed in conjunction with the Terms, Acebedo notified WorldPay that it was terminating its accounts effective March 10, 2010. Although Acebedo would have liked to terminate sooner, it did not want to be billed an early termination fee and thus complied with the Terms' 90-day notice provision.

105. Acebedo thereafter stopped processing transactions through its WorldPay account and resigned itself to the fact that WorldPay would continue to deduct (by this point) the many unauthorized monthly fees until the effective date of termination in March 2017.

106.    Acebedo instructed its bank to refuse any attempt by WorldPay to automatically debit Acebedo's account after March 2017.   This is fortunate because in April 2017, WorldPay predictably attempted to deduct via ACH withdrawal from Acebedo's account several hundred dollars in fees.

107.    Acebedo emailed WorldPay to remind it that the contract had been terminated and attached the notice of termination.   WorldPay ignored the letter and indicated that Acebedo would need to call customer service to effectively terminate its accounts.   This, of course, is directly contrary to the Terms, which requires written notice.   *See* Acebedo Terms, § 11.6.

108.    In May 2017, WorldPay again attempted to deduct via ACH withdrawal from Acebedo's bank accounts and started to send collection notices to Acebedo.   It was only after Acebedo's counsel sent a letter to WorldPay's counsel that WorldPay finally acknowledged the termination and ceased collection efforts.

109.    While a customer, and despite no contractual obligation to do so, Acebedo lodged written complaints with WorldPay.   For example, on January 10, 2017, Acebedo emailed WorldPay customer service to dispute the annual fee that appeared on its December 2016 statement and was automatically deducted from its bank account in early January 2017.

110.    WorldPay's email response was that such fees were proper because annual fees are recurring fees that Acebedo had been charged in prior years.   In other words, WorldPay's position was that because Acebedo had failed to notice the fees on prior years' statements, it was obligated to continue paying such fees. This "two wrongs make a right" logic was unacceptable to Acebedo.

## B.    <u>IDL Quad Group, LLC.</u>

111.    Plaintiff IDL Quad enrolled in WorldPay's services through a seemingly reputable sales agent – Judy Hagerty of WorldPay-affiliated ISO/MSP Radiant Systems – in June of 2010.

112.    IDL Quad was induced to contract based on the Agreement's fraudulent misrepresentations concerning fees.   IDL Quad agreed to a cost plus pricing program whereby it would pay the pass through payment network costs plus .10% and $0.10 per transaction.   *See* IDL Quad Agreement, p. 2.

113.    IDL Quad also agreed to specified recurring fees disclosed in Agreement, including a $20 monthly administrative fee.   *Id.* at 3.

114.    There was no PCI program fee specified in the Agreement, thus IDL Quad did not expect to pay such a fee.   *Id.*

115.    At no time before she signed the Agreement was IDL Quad principal Angela Green advised that these identified rates and fees would be increased or

previously unspecified fees would be added. Had she known that Defendant intended to charge much higher rates and fees, she would not have signed the Agreement.

116.  During many months while it was a customer, IDL Quad was overcharged by Defendant in violation of the contractual terms that were entered (based only on Defendant's fraud and misrepresentations).

117.  Rather than pass through the payment network fees and charges at cost, WorldPay inflated them. For example, rather than pass through the Visa, MasterCard, and Discover access fees at cost (*see* ¶ 59-60, *supra*), WorldPay inflated them. WorldPay steadily increased these charges over time, often blaming the increases on the payment networks.

118.  By the end of its relationship with WorldPay, IDL Quad was being charged the following access fees: .0249 for MasterCard transactions, .0270 Discover transactions, and .0246 Visa transactions (regardless of whether the transaction was credit or debit). These charges grossly exceeded the true access fees of: .0195 MasterCard, .0195 Discover, and .0195 Visa Credit/.0155 Visa Debit. These improper increases caused IDL Quad to be overbilled by more than $1,000 during its time as a customer.

119.     Additionally, in April 2012 and for every month thereafter while it was a customer, Defendant charged IDL Quad a monthly fee of $4.25 on each account for Visa's fixed acquirer network cost.  The $4.25 amount is greater than the actual fixed acquirer network cost that Visa assessed for the IDL Quad account. Upon information and belief such amount was $2.00 per account, resulting in overcharges in excess of $100.

120.     Starting in October 2011, WorldPay deducted a monthly fee of $12.95 from IDL Quad's account for enrollment in WorldPay's PCI program despite the fact that the Agreement fails to mention such a fee and IDL Quad never requested to be enrolled.  All told, WorldPay wrongfully seized more than $800 in PCI program fees from IDL Quad's account.

121.     WorldPay effectively hid its overcharges within its convoluted statements and by taking funds throughout the month so the overbilling went unnoticed and IDL Quad was not even aware it was happening.

122.     For instance, IDL Quad had no idea that WorldPay was inflating the payment network fees, as opposed to passing them through at cost.  Indeed, the statements were formatted to lead Ms. Green to believe that the access fees and fixed acquirer fee amounts were mandated by the payment networks and they were successful in doing so.

123.    For example, on each of its statements, WorldPay attributed the inflated access fees to the various payment networks by labeling them "Visa Access Fees," "Discover Access Fee," and "MasterCard Access Fees," or in some cases, "Access Fees for Visa transactions," "Access Fee for Discover transactions," and "Access Fees for MasterCard transactions."

124.    Moreover, whenever WorldPay increased these fees, it provided messages blaming the increases on the payment networks.  For example, on its March 2016 statement, WorldPay sent IDL Quad the following message:

> The card associations and networks have announced they plan to implement price changes in April. The Access fees for each network will go up as follows: Visa + $0.0001, MasterCard +$0.001, and Discover +$0.001.

This message is false.  Unbeknownst to IDL Quad, however, the payment networks had not decided to increase their access fees by these precise amounts.  Rather, these increases were calculated and added by WorldPay to pad its own bottom line.

125.    By way of additional example, on its March 2012 statement, WorldPay sent IDL Quad the following message:

> Effective April 1, all acquirers will be charged a new Fixed Acquirer Network fee for each merchant that accepts Visa-branded cards. A new line item called "Fixed Acq Network Fee – Retail" will now appear on your statements with a corresponding fee of $4.25 to cover this new cost.

This message falsely insinuates that WorldPay's "new cost" as a result of the Visa Fixed Acquirer Network fees ("FANF") is $4.25 per month and WorldPay is just passing this cost through to IDL Quad.

126.    In reality, however, the amount of Visa FANF fees depends on a number of factors, including merchant category code (MCC), the mix of card present and card not present volume, and the number of locations the business operates.  The FANF can vary from month to month for each merchant depending on these factors but is typically $2.00 to $2.90 per month for most merchants, not $4.25 per month.

127.    WorldPay thus not only inflated the FANF fee, but falsely insinuated to IDL Quad that the fee was simply being passed through at cost.

128.    These craftily designed notices led IDL Quad and all other merchants who received them to believe WorldPay was indeed abiding by the contract and only passing through card network fees at cost.  These messages lulled merchants to sleep and precluded them from reasonably discovering that the promises made in the contract – promises that induced them do to business with WorldPay – were false.

129.    In or about October 2016, IDL Quad learned from a WorldPay competitor that it was being cheated and charged numerous inflated fees and other

42

fees it never agreed to pay.  IDL Quad immediately stopped using WorldPay's services and migrated its business to a new processor.

130.     Although IDL Quad was not using its account, WorldPay continued to automatically debit fees for several more months from its account.

### C.     Medical Legal Consultants of Greater Atlanta, LLC.

131.     Plaintiff MLC enrolled in WorldPay's services through WorldPay directly, via account executive Gloria Taylor in August of 2016.  MLC intended to use WorldPay's services as a "back up" to his primary processor, Square.  Thus, it was important to MLC principal Dr. David Wright that he only pay fees when he actually used the service.

132.     Dr. Wright informed Ms. Taylor of this and they agreed that he would enroll in a cost plus plan and pay pass through payment network costs plus a per item fee of $.10 with no other fees.

133.     On August 23, 2016, Ms. Taylor emailed Dr. Wright a copy of the three-page contract and marked the spaces that he needed to fill out on the contract with "x's."

134.     Dr. Wright printed the contract, filled out his name and business information next to the "x's" marked by Ms. Taylor.  He also wrote in the agreed-

upon rate and scratched through all the other fees and returned it to Ms. Taylor. *See* MLC Agreement.

135.     Ms. Taylor thereafter notified Dr. Wright that MLC had been approved as a WorldPay customer.   In early September of 2016, Dr. Wright received a "Welcome to Worldpay" email.

136.     MLC was induced to contract based on the Agreement's fraudulent misrepresentations concerning fees.   MLC agreed to a cost plus pricing program whereby it would pay the pass through payment network costs plus a per item fee of $0.10.   *See* MLC Agreement, p. 2.

137.     At no time before he signed the Agreement was Dr. Wright advised that this identified fee would be increased or previously unspecified fees would be added.   Had he known that Defendant intended to charge much higher rates and fees, he would not have signed the Agreement.

138.     During the short time it was a customer, MLC was overcharged by Defendant in violation of the contractual terms that were entered (based only on Defendant's fraud and misrepresentations).

139.     Rather than pass through the payment network fees and charges at cost, as the Agreement specified it would, WorldPay inflated them.   For example, MLC was subjected to the same access fee increases that victimized IDL Quad.

Indeed, WorldPay charged MLC access fees of .0246 for Visa transactions (regardless of whether the transaction was credit or debit).  This charge exceeded the true access fee of: .0195 Visa Credit/.0155 Visa Debit.  This increase caused IDL Quad a small amount of quantifiable damages.

140.    Moreover, on January 6, 2017, WorldPay automatically debited MLC's bank account for a charge exceeding $200.  It turns out this egregious amount included a $169.99 annual fee, called "Annual Compliance Services Fee."

141.    Dr. Wright did not expect to pay such a large charge and instructed his bank to reverse it, which it temporarily did for a fee.  He also ceased use of WorldPay's services.

142.    Dr. Wright immediately emailed his representative, Gloria Taylor, to dispute the prior month's charges, including the annual fee.  Dr. Wright reminded Ms. Taylor that he was not supposed to be billed any annual fees.

143.    On January 9, 2017, Ms. Taylor responded and agreed with Dr. Wright that such a large annual fee is not mentioned in his Agreement and advised him to call customer service to get to the bottom of this fee.

144.    On January 10, 2017, Dr. Wright tried calling WorldPay customer service but could not get through to an actual representative.  He also emailed Ms. Taylor to advise her of the status.

145.    On January 13, 2017, Dr. Wright emailed WorldPay indicating he never agreed to pay the annual fee.  He also paid an additional amount to his bank to permanently block all future debits from WorldPay.

146.    On March 6, 2017, Dr. Wright emailed and called WorldPay customer service and instructed Defendant to terminate his account.  WorldPay responded by indicating that he could only terminate his account if he paid a $295 early termination fee.

147.    This was unacceptable to Dr. Wright.  Dr. Wright called Gloria Taylor to attempt to reach a resolution.  She responded that there was nothing she could do but she was not surprised WorldPay management had billed him for an annual fee.  She said that Defendant was unethical and often added fees that were not specified in the Agreement.  She expressed her disgust with WorldPay's practices because they regularly make her look like a liar to those customers she has signed up.  Further, she was frustrated because Defendants' overbilling ultimately costs her commission money because merchants often terminate their accounts in response.

148.    At this point, Dr. Wright realized that he may have been overcharged other fees by WorldPay and contacted WorldPay to obtain a record of the fees charged.  To that point, Dr. Wright had never received a monthly statement.

149.    He was informed he could access his statement records via WorldPay's online portal, so he registered and printed his statements to date.  He realized that he had been charged multiple fees not identified on his Agreement, including monthly administrative fees and "PAYware Mobile" fees (in addition to the improper fees referenced above).

150.    In the *Alghadeer* case, WorldPay produced what it contended was MLC's contract.  *See* Alleged MLC Agreement (Exh. F hereto).  The first page of the contract matches the page signed by Dr. Wright except some information was added to the "Business Info" section after he signed and returned to WorldPay.  The second page is forged and contains information, handwriting, and initials that do not match those of Dr. Wright.  *Id.* at 2.

151.    It appears someone at WorldPay created this page after-the-fact.  Unsurprisingly, this fake page includes several fees Dr. Wright never agreed to pay, including a monthly administrative fee of $9.95 per month, a monthly "PayWare Mobile" fee of $14.95 per month, and a .10% "plus" rate as opposed to the agreed $0.10 per item fee.  *Id.* at 2.  Notably, it still fails to disclose any annual fee and indicates that only "standard Payment Network fees and charges" will be imposed.  *Id.*

152.     The third page also forges Dr. Wright's initials.  This page was not even transmitted to him in Ms. Taylor's August 23, 2016 email with the three pages he did complete.  The fourth page, which contains Dr. Wright's signature on the Agreement, is accurate.

153.     It appears that Dr. Wright was thus a victim of out-and-out fraud and forgery, in addition to WorldPay's standard schemes.

154.     After Dr. Wright attempted to terminate, WorldPay continued to try to automatically debit MLC's bank account for several more months before it apparently (and finally) gave up.

155.     These are but a few examples of Defendant's improper payment processing overcharges.  All customers suffered from Defendant's systematic practices of inducing merchants to do business through fee promises that they never intended to keep and adding fees in violation of Defendant's contracts with customers.  When Defendant desired to increase profits – which was often – it simply tinkered with a payment processing fee, applied it across thousands of customers in an automated fashion, and reaped the increased profits.

156.     Not only did this strategy pad WorldPay's profits, but its ability to trick many thousands of customers to signing up led to an increase in its recent sale price to Vantiv of over $10,000 per customer.  WorldPay was actively trying to sell

itself over a period of several years.  Clearly, WorldPay was incentivized to keep customers in the dark about its practices so they would sign up and stay with the company until a sale could be concluded.

## **ANTICIPATED CONTRACTUAL DEFENSES**

157.    It is anticipated that WorldPay will lean heavily on the Terms in an effort to defend its conduct.  However, since Plaintiffs were fraudulently induced to enter a contractual relationship with Defendant, their contracts are subject to rescission and such provisions are not enforceable.

158.    In any event, the Terms do not authorize WorldPay's pricing transgressions.

159.    *Contractual Notification.*  In *Alghadeer*, WorldPay has argued that the Terms require merchants to give written notice of any billing errors within 30 days of receipt of the statement containing the error.

160.    With respect to Acebedo, this is plainly incorrect.

Their Terms contain a provision which states:

Customer shall be solely responsible for reviewing its statements from RBS Lynk and for reporting to RBS Lynk in writing, within 30 days of Customer's receipt of any monthly statement from RBS Lynk, any underpayments, overpayments or other discrepancies *between the volume and/or value of transactions that Customer actually processed during the period indicated on the face of such statement.*

Acebedo Terms, § 7.5 (emphasis added).

49

161.    By its own terms, this obligation to timely review and report only applies to issues related to the volume or value of card transactions.  Acebedo does not take issue with the volume or value of their card transactions.  Rather, it takes issue with the fees charged by WorldPay, which are not covered by the provision.

162.    MLC's Terms, meanwhile, contain a different provision, which requires the merchant to review its monthly statements and report to WorldPay in writing within 30 days of receipt of such statements:

> any underpayments, overpayments or other discrepancies of ***any items*** reflected on such statement or related to the period covered by such statement . . .

MLC Terms, § 7.5 (emphasis added).

163.    This provision is worded differently than that applicable to Acebedo, but applies only to "items," an undefined term which WorldPay (appropriately) uses interchangeably with card transactions.  It too does not apply to fees such as those at issue here.

164.    Because the Terms' "contractual notification" requirements are inapplicable, they are irrelevant to this suit.  However, even if these provisions are given the expansive interpretations suggested by WorldPay, they violate Georgia law and public policy, including because they are unduly exculpatory and unconscionable, and are otherwise void and unenforceable.

50

165.    Any running of the Terms' "contractual notification" requirements were also equitably tolled given Defendant's convoluted statements, most notably its communication of false messages that were designed to deceive and mislead the identified Plaintiffs and Class members into believing Defendant was abiding by the promises that induced the contract.

166.    Moreover, regardless of these provisions' applicability and enforceability, Acebedo and MLC provided Defendant with timely, written notice of allegedly improper fees. *See* ¶¶ 109, 136, 139, *supra*.

167.    *Amendment.*  WorldPay may also argue that the Terms give it a "blank check" to increase fees or impose new fee categories, regardless of whether such actions materially conflict with the pricing set forth in the Agreement.

168.    With respect to Acebedo, this is plainly not so.  Section 1 of their Terms define "Processing Charges" as those charges "set forth on the accompanying Fee Schedule, as amended from time to time pursuant to Section 5.4."  Acebedo Terms, § 1.

169.    Thus, WorldPay only has the right to amend the fees pursuant to Section 5.4.  This section gives WorldPay the right to amend processing fees "[i]f the actual volume or average transaction size is materially different [than as set forth on the Agreement], or if Customer significantly alters its method of doing

business."   Acebedo Terms, § 5.4.   Here, neither of these conditions occurred. Indeed, WorldPay's pricing changes are wholly unrelated to any activity of any individual Plaintiff or other customer.   Rather, these are strategic, automated changes that apply to many thousands of merchants.

170.    Section 5.5 also purports to give WorldPay a limited right to adjust the processing fees to "reflect increases, decreases, or new interchange, assessments, or other fees by the Card Associations, or to pass through increases charged by third parties for online communications and similar items."   Acebedo Terms, § 5.5.   However, the increases complained of herein were not taken in response to pricing changes made by the payment networks or other third parties. Rather, they are just additional fees imposed by WorldPay to increase profitability at merchant expense.

171.    Finally, in Section 5.2, labeled "Deduction of Processing Charges," after a few sentences that actually discuss how processing charges are deducted, there is an unrelated provision which states:

> Bank or RBS Lynk with Bank's approval from time to time may amend the Fee Schedule.  The prices set forth in an amended Fee Schedule shall be effective on the date specified in the notice thereof, which date shall not be fewer than 15 days after the date of the notice. Each such revised or supplemental Fee Schedule shall thereafter be deemed a material part of this Agreement.

Acebedo Terms, § 5.2.

172.    This provision does not excuse Defendant's pricing manipulations for several reasons.  First, it requires advance notice, which Defendant did not provide for many of the fees at issue, including inflated payment network charges.  *See* ¶ 78, *supra*.

173.    Second, in those situations where Defendant did provide advance notice, it often did not do so in accordance with the Terms, which require mailed notice.  *Id.* at ¶ 79, *supra*.  Indeed, Worldpay often purported to give notice via its online portal, as opposed to via the U.S. mail, which is not allowed.

174.    Third, the form, format, and content of the notices given by WorldPay were wholly insufficient to meet the contractual requirement of an "amended," "revised," or "supplemental Fee Schedule."  The half-hearted notices that did go out never amounted to the necessary "amended Fee Schedule."  *Id.* at ¶ 80, *supra*. None of the advance notices that were provided indicate that the fee schedule set forth in the Agreement is being amended or direct Plaintiffs to the revised or supplemental Fee Schedule; rather, they just purport to charge new fees.

175.    Fourth, on information and belief, WorldPay's member bank (Citizens Bank) did not approve of WorldPay's fee changes.  Member bank approval is an essential requirement for any new or revised fee.  It is not only required by the Terms, but by the rules of the card networks themselves, with which WorldPay is

obligated to comply.   For instance, the MasterCard Rules state: "The Merchant Agreement . . . may not be modified in any respect without the express written agreement of the [Member Bank]." *Id.* at § 7.6.1(1)(b).

176.    To summarize, WorldPay's manipulations to Acebedo's fees were not authorized by Section 5.2.

177.    Even if they were authorized, however, Section 5.2 is not enforceable and Defendant may not use it to justify its decision to charge more than merchants agreed to pay.

178.    This provision is invalid because it lacks mutual consideration. Indeed, the provision purports to give Defendant the unfettered discretion to change the pricing of its services (the most material of all terms) for any reason or no reason.   This renders Defendant's promise to provide services in exchange for the rates and fees set forth within the Agreement illusory and unenforceable for lack of consideration.

179.    Even if Section 5.2 were not illusory, it is unconscionable.   The provision is procedurally unconscionable because the bargaining process was fundamentally unfair.   Defendant (the stronger party) intentionally did not note on the Agreement – the document that all merchants (the weaker parties) review and

sign – that it gave itself discretion to change rates and fees set forth in the Agreement.

180.     Instead, Defendant set forth this purported right deep in the Terms, a separate document from the Agreement that is only noted on the Agreement in small, inconspicuous print.   To make matters worse, Defendant buried the provision under a heading that referenced an inapposite topic, making it unlikely merchants who were concerned about fee increases would locate it.

181.     Defendant knew such a provision would be important to merchants and would affect their decision to do business with Defendant.   By burying the provision in the separate Terms, Defendant knew that merchants would never become aware of it until after the Agreement was signed and a contract was formed.   Moreover, Defendant engaged in the foregoing deceptive acts despite knowing full well that Section 5.2 could have a profoundly detrimental effect on merchants' ability to receive the fruits of the contract (i.e., services over the life of the term for the contracted-for rates and fees, as opposed to the rates and fees that Defendant subsequently determined it wanted to charge (if it could obtain approval from Citizens Bank)).

182.     Section 5.2 is also substantively unconscionable because it is wholly one-sided and unreasonably favorable to Defendant.   Indeed, it provides Defendant

complete control to disregard the agreed-upon rates and fees and charge merchants whatever it wants over the term of the contract.

183.    This unfettered discretion is especially dangerous here because Defendant automatically debits monies from merchant accounts before it provides statements itemizing such debits.  Thus, Section 5.2 allows Defendant to double or even triple the agreed-upon rates and to seize such additional amounts from merchants *before* merchants have any opportunity to object, let alone to refuse payment.

184.    Merchants must either live with paying much higher fees than they were informed they would pay at the beginning of the deal or subject themselves to the costly early termination penalties, which are typically several hundred dollars.  No merchant in their right mind would ever voluntarily agree to such a "Catch 22" situation.

185.    Section 5.2 violates public policy, lacks mutuality, is illusory, unconscionable, and is otherwise void and unenforceable pursuant to applicable Georgia law.

186.    MLC's Terms are materially different than Acebedo's Terms when it comes to pricing amendments.  *Compare* Acebedo Terms, § 5.2 *with* MLC Terms, § 11.9.  For instance, MLC's Terms purport to provide a merchant with the right to

terminate the Agreement without the payment of an early termination fee within 15 days of WorldPay providing notice of a fee increase.  MLC Terms, § 11.9.

187.    The facts will show that WorldPay does not actually afford such right to merchants, however.  For instance, the very day Dr. Wright discovered that MLC had been charged an annual fee he never agreed to, he complained in writing to WorldPay.  He was not allowed to terminate.  In fact, WorldPay subsequently told him he had to pay the early termination fee if he wanted to terminate.

188.    Other WorldPay customers have confirmed that WorldPay does not honor early termination requests without payment of the early termination fee. Clearly, the purported "right" to terminate when fees are increased is a nullity and the Section 11.9 in MLC's Terms is just as unenforceable as the Section 5.2 in Acebedo's Terms.

189.    Finally, even if Sections 5.2 and 11.9 gave WorldPay discretion to modify merchant pricing, good faith and fair dealing constrains WorldPay's ability to manipulate fees in a manner not contemplated by the parties.  Contractual discretion is not a license to steal.

190.    Here, WorldPay's manipulation of Plaintiffs' fees and charges was done for no other reason than to increase profits.  Indeed, based largely on improved technology and increased competition, fees and costs for payment

processing have been gradually declining for several years.  Massive undisclosed fees and fee increases were wholly unwarranted and thus WorldPay's activities do not comport with good faith and fair dealing.

191.  *Voluntary Payment.*  The voluntary payment doctrine also does not apply here.  Indeed, by the time statements were made available to Plaintiffs breaking down the prior month's payment processing charges, WorldPay had already taken such amounts from Plaintiffs' bank account.  Thus, all fees are charged and taken *before* statements are delivered (and Plaintiffs receive notice of such fees).

192.  Moreover, even if merchants had received and could reasonably decipher Defendant's monthly statements (which they cannot), many of the complained-of fees appear to be legitimate pass through charges (e.g., access fees and fixed acquirer network fees).  This is why Defendant refers to the payment networks by name when describing such charges – it wants merchants to presume they are typical pass through fees (even though, in fact, they had been surreptitiously inflated by Defendant).  For these and other reasons, the voluntary payment doctrine is inapplicable.

## CLASS ALLEGATIONS

193.     Plaintiffs bring this action on behalf of themselves and all United States customers of Defendant who contracted for payment processing services and paid a fee not listed in the in the Customer Processing Agreement.

194.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.  It is very likely that additional classes or subclasses will be appropriate, perhaps based on the applicable versions of the Terms.

195.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

196.     WorldPay may argue that all putative Class members that were enrolled on or after September 30, 2017 are bound by its new Terms, which require the arbitration of all disputes, and thus cannot be members of the Class.  Plaintiffs were not customers at this time.

197.    It is true that WorldPay provided a statement notice to its existing customers that it would amend the terms and conditions effective September 30, 2017.  This notice included a link to the purported new Terms.  This move by WorldPay was an attempt to reduce its exposure in the *Alghadeer* case, which had been pending for more than a year before the notice of the new Terms was provided to merchants.

198.    Plaintiffs are confident WorldPay's unilateral efforts to deprive many of its customers of their day in Court will be rejected on multiple grounds, including but not limited to such changes are not allowed by the pre-existing Terms, were not approved by Citizens Bank (which is a requirement under WorldPay's terms, the bank's contract with WorldPay, and the applicable payment network rules), and/or cannot be enforced based on equitable and contractual principles.

199.    The time period for the Class is the number of years immediately preceding the date on which *Alghadeer* was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.  All of Defendant's contracts mandate that Georgia law be applied.  By way of example only, Georgia imposes a six-year statute of limitations on breach of contract actions.  Thus, if Georgia law is deemed

to apply, the relevant class period for breach of contract is likely to begin August 26, 2010 and extend through Defendant's change in conduct or the conclusion of the case.  It is also possible that the applicable statute of limitations will be tolled based on Defendant's improper conduct as previously alleged.

200.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

201.    *Numerosity.*   The members of the Class are so numerous that individual joinder of all the members is impracticable.  There are in excess of 200,000 merchants that have been damaged by Defendant's wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiffs, but can readily be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

202.   *Commonality and Predominance.*   Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members.  Such questions include, but are not limited to:

(a).   Whether Defendant has established a scheme to sign up new customers by promising rates and fees it knows are less than the actual rates and fees that will be charged;

(b).   Whether Defendant directly violated its contracts with merchants by assessing improper fees;

(c).   Whether Defendant violated the covenant of good faith and fair dealing in its efforts to impose excessive fees;

(d).   Whether Defendant is liable to Plaintiffs and the other Class members for imposing improper fees;

(e).   Whether certain contractual provisions in Defendant's Terms re invalid exculpatory clauses, violate public policy, lack mutuality, are illusory, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

(f).   The proper method or methods by which to measure damages and/or restitution; and

(g).    Whether Defendant should be enjoined from engaging in any or all of the improper practices complained of herein.

203.    Defendant has engaged in a common course of conduct toward Plaintiffs and the other Class members.  The common issues arising from this conduct that affect Plaintiff and the other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

204.    _Typicality._  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.  Further, Plaintiffs and the members of the Class were comparably injured through the uniform misconduct described above.

205.    _Adequacy of Representation._    Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

206.     *Declaratory and Injunctive Relief.*  Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendant continues to knowingly enroll customers through fraud and misrepresentation, overbill customers, and utilize inapplicable, unenforceable contractual provisions in order to block the Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

207.     *Superiority.*  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

## COUNT ONE
## Fraudulent Inducement

208.     Plaintiffs repeat paragraphs 1 through 192 above.

209.     As alleged herein, Defendant intentionally and fraudulently induced the identified Plaintiffs and the Class members to enter into contracts with Defendant through its material omissions and material affirmative promises of pricing terms that Defendant never had any intention to honor.

210.     Among other things, Defendant intentionally (a) prominently promised the Plaintiffs and the Class members, as an inducement to enter into business with Defendant, rates and fees that were lower and different than what Defendant knew would be charged, (b) failed to properly disclose the true applicable rates and fees on the Agreement or elsewhere, and (c) disclosed rates and fees that do not reflect, omit, conceal, and affirmatively misrepresent the true pricing that Defendant knew it would apply.

211.     Defendant knew that its disclosed pricing terms did not accurately reflect the rates and fees it would ultimately charge merchants, including the Plaintiffs and the other Class members, at the time the Agreements were provided

to such merchants.   Defendant made the foregoing misrepresentations and omissions alleged herein to induce the Plaintiffs and the other members of the Class to rely on them.

212.   Defendant's misrepresentations and omissions alleged herein were material, including in that they would be considered very important to merchants in deciding whether or not to do business with Defendant, and were known by Defendant to be false and misleading.   Plaintiffs would not have entered their Agreements if they had listed the rates and fees WorldPay knew that it would charge.

213.   Defendant's true pricing includes but is not limited to: (a) new annual fees, (b) new fees for the PCI programs, (c) new fees for PCI non-compliance/non-validation, (d) new and increased minimum processing fees, (e) categorically improper pass through fees on tiered pricing customers, (e) marked-up pass through fees, and (f) increased processing fees.

214.   Prior to executing Agreements and forming a contract with Defendant, the identified Plaintiffs and the other Class members were deceived by Defendant with respect to the pricing terms that would be applicable to their accounts.

215.   The nature and amounts of fees charged, as represented by Defendant at the time of merchant enrollment (including in the Agreement) were material to

and justifiably relied upon by Plaintiffs and the other Class members. Had Defendant accurately represented its true pricing terms to Plaintiffs and the other Class members, and not misrepresented, obscured, and concealed their true pricing terms from them, Plaintiffs and the Class members would not have contracted with Defendant to receive payment processing services.

216. Any statutes of limitation applicable to Plaintiffs and Class members were tolled by Defendant's convoluted statements, most notably its communication of false messages that were designed to deceive and mislead the identified Plaintiffs and Class members into believing Defendant was abiding by the promises that induced the contract.

217. Accordingly, Plaintiffs and the other Class members were fraudulently induced to enter into contracts with Defendant.

218. Plaintiffs and the Class members are entitled to seek damages and/or rescission of their contracts with Defendant, or other equitable relief, including restitution of funds Defendant took from them without permission.

219. Plaintiffs will make any necessary election of remedies at the appropriate juncture.

## COUNT TWO
### Breach of Contract and
### Breach of the Covenant of Good Faith and Fair Dealing

220.　　Plaintiffs repeat paragraphs 1 through 192 above.

221.　　Even if it is determined that Plaintiffs and the Class members were not fraudulently induced to contract with Defendant and a binding contract exists between Plaintiffs and the Class members, on the one hand, and Defendant, on the other hand, Defendant has materially violated the specific terms of such contracts.

222.　　Indeed, Defendant's Agreement sets forth various fees to be charged. Yet, from the earliest stages of the relationship, Defendant has assessed additional fees in conflict with the Agreement, including but not limited to (a) new annual fees, (b) new fees for the purported PCI program, (c) new fees for PCI non-compliance/non-validation, (d) new and increased minimum processing fees, (e) categorically improper pass through fees on tiered pricing customers, (e) marked-up pass through fees, and (f) increased processing fees.

223.　　The improper fees described above are not a complete list of improper fees charged by Defendant, but merely examples.

224.　　Defendant's assessment and deduction of fees from the accounts of Plaintiffs and the members of the Class do not comply with the Agreement and/or the amendment provisions set forth in the Terms.

225.     Further, through its conduct alleged herein, Defendant has separately breached its form contracts with Plaintiffs and the Class members by exercising the discretion afforded by the Terms' amendment provisions to raise fees or add new fees in violation of the covenant of good faith and fair dealing.

226.     For instance, in exercising its discretion to raise the amounts of the rates and fees disclosed on the Agreement, Defendant abused that discretion. Indeed, Defendant imposed these increases not in response to any external factor but merely to pad its own bottom line and increase its sales price to potential acquirers.  The increased fees far exceed what Plaintiffs and the Class members reasonably expected and were led by Defendant to expect.  This conduct by Defendant was arbitrary and in bad faith.

227.     Defendant's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the Class members the full fruits of their bargains with Defendant.

228.     Plaintiffs and the Class have performed all, or substantially all, of the conditions precedent and obligations imposed on them under the contract.  There is no legitimate excuse or defense for Defendant's conduct.

229.     Defendant's anticipated attempts to defend their overbilling through reliance on self-serving contractual provisions will be without merit.  Such

provisions are either inapplicable or unenforceable because they are void, illusory, lack mutuality, are invalid exculpatory clauses, violate public policy, and are procedurally and substantively unconscionable, among other reasons.   These provisions do not excuse Defendant's breaches or otherwise preclude Plaintiffs and the Class from recovering for such breaches.

230.     Any statutes of limitation applicable to Plaintiffs and Class members were tolled by Defendant's convoluted statements, most notably its communication of false messages that were designed to deceive and mislead the identified Plaintiffs and Class members into believing Defendant was abiding by the contract.

231.     Plaintiffs and the members of the Class sustained damages as a result of Defendant's direct breaches of contract and breaches of the covenant of good faith and fair dealing.

## COUNT THREE
### Unjust Enrichment

232.     Plaintiffs repeat paragraphs 1 through 192 above.

233.     Plaintiffs, on behalf of themselves and the other Class members, assert a common law claim for unjust enrichment.   This claim is brought only in the alternative and is contingent on Defendant's contracts with Plaintiffs and the Class members being deemed fraudulently induced and subject to rescission, ineffective, inapplicable, void, or otherwise unenforceable.   In such a scenario, unjust

enrichment will dictate that Defendant disgorge all monies and items unjustly received.

234.    As alleged herein, Defendant was unjustly enriched at the expense of Plaintiffs and the other Class members, who were improperly charged and overcharged by Defendant.

235.    Plaintiffs and other Class members were unjustly deprived of money obtained by Defendant as a direct and proximate result of their fraudulent inducement to enter contracts which they never would have entered but for Defendant's misrepresentations.

236.    Plaintiffs and the other Class members were unjustly deprived of money obtained by Defendant as a direct and proximate result of their contract, which may be deemed void or unenforceable in whole or in part by this Court.

237.    It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other Class members as a result of the wrongful conduct alleged herein.

238.    Any statutes of limitation applicable to Plaintiffs and Class members were tolled by Defendant's convoluted statements, most notably its communication of false messages that were designed to deceive and mislead the identified Plaintiffs and Class members into believing Defendant's charges were just.

239.     Plaintiffs and the other Class members are entitled to seek restitution from Defendant as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Class demand a jury trial on all claims so triable and judgment as follows:

1.     Certifying this case as a class action pursuant to Federal Rule 23;

2.     Temporarily and permanently enjoining Defendant from continuing the improper practices alleged herein;

3.     Granting rescission of the contracts;

4.     Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

5.     Awarding damages in an amount to be determined by a jury;

6.     Requiring restitution or disgorgement of all amounts improperly obtained by Defendant;

7.     Awarding pre-judgment interest at the maximum rate permitted; and

8.     Awarding such other relief as this Court deems just and proper.

DATED this 31st day of May, 2018.

Respectfully submitted,

BY:    WEBB, KLASE & LEMOND, LLC

/s/ E. Adam Webb
E. Adam Webb
  Georgia Bar No. 743910
Matthew C. Klase
  Georgia Bar No. 141903

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)
Adam@WebbLLC.com
Matt@WebbLLC.com

*Attorneys for Plaintiffs*