## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| _____ ) | |
| ALGHADEER BAKERY & MARKET, INC., ) | |
| on behalf of itself and all others similarly situated, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | |
| v. ) | NO. 1:16-cv-03627-MLB |
| ) | |
| WORLDPAY US, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |
| ACEBEDO & JOHNSON, LLC, ) | |
| IDL QUAD GROUP, LLC, and ) | |
| MEDICAL LEGAL CONSULTANTS ) | |
| OF GREATER ATLANTA, LLC, on behalf of ) | |
| themselves and all others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | CIVIL ACTION |
| ) | |
| v. ) | NO. 1:18-cv-02688-MLB |
| ) | |
| WORLDPAY US, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT
## AND CERTIFICATION OF SETTLEMENT CLASS

On January 10, 2020, the Court issued preliminary approval to the settlement and notice program and provisionally certified the settlement class. *See* Preliminary Approval Order (Dkt. 79 in Case No. 16-cv-3627-MLB; Dkt. 30 in Case No. 18-cv-2688-MLB). Notice has now been provided to the class and Plaintiffs hereby move for final approval of the settlement and certification of the settlement class. The settlement – which consists of (1) a common fund of $15 million to be distributed to current and former customers of Defendant Worldpay US, Inc. ("Worldpay") that were allegedly overcharged for processing payment card transactions and (2) critical practice changes that will help protect merchants from future unwanted price increases – was negotiated by veteran lawyers following extensive discovery and expert analysis. The settlement is an outstanding achievement that will provide immediate benefits to the settlement class without further risks or delay. Moreover, the notice program, as implemented, satisfies due process and Rule 23 and the settlement class satisfies the requirements for certification. This motion should thus be granted.

## BACKGROUND

**A.    Facts and Procedural History.** Worldpay provides card processing services to merchants. *E.g.*, Dkt. 1 in Case No. 18-cv-2688-MLB, ¶ 1. Worldpay enrolls merchants in its processing services after having them sign a form customer

1

processing agreement. *Id.* at ¶ 32. Each signed agreement is subject to Worldpay's terms and conditions. *Id.* at ¶¶ 71-72. Worldpay then proceeds to process card transactions and send statements that summarize card transactions and the applicable fees. *Id.* at ¶¶ 76-82.

Plaintiffs asserted two primary theories. First, Plaintiffs alleged that Worldpay fraudulently induced contractual relationships by failing to disclose fees it knew merchants would pay for its services and then subsequently breached the contract by increasing and adding new fees in violation of the terms and the implied covenant of good faith and fair dealing. *Id.* at ¶¶ 30-156, 208-31. Plaintiffs alternatively alleged that fine print terms and conditions purporting to immunize Worldpay from misconduct were unenforceable and that Defendant had been unjustly enriched. *Id.* at ¶¶ 157-99, 229, 232-39. Plaintiffs sought recovery on behalf of a national class of merchants.

The *Alghadeer* action was originally filed in state court on August 26, 2016, by Alghadeer Bakery and its owner Hameed Alburkat.[1] *See* Dkt. 1-1 in Case No. 16-cv-3627-MLB. After removal and an initial motion to dismiss was filed, the complaint was amended and the Court entertained a motion to dismiss the amended complaint. Joint Decl. ¶¶ 14-20. On June 6, 2017, the Court dismissed Mr. Alburkat for lack of

---

[1] A detailed summary of the pleadings, motion practice, discovery, and mediation/settlement negotiations is set forth in the Joint Declaration of E. Adam Webb and Matthew C. Klase ("Joint Decl."). *See* Dkt. 77-2 in Case No. 16-cv-3627-MLB; Dkt. 28-2 in Case No. 18-cv-2688-MLB.

standing and ordered discovery to determine which version of the contract governed the Bakery's claims. *Id.* at ¶ 22. At the Court's request, the parties also entered into an agreement tolling the statutes of limitation applicable to the claims of other merchants that wanted to file their own cases (including Plaintiffs Acebedo, IDL Quad, and MLC). *Id.* at ¶¶ 23-24.

Following contract discovery, the parties stipulated to the governing contract version and Defendant answered the complaint. *Id.* at ¶¶ 25-27. Defendant thereafter sought partial summary judgment on the Bakery's claims that several provisions of the contract were unenforceable and that Worldpay had been unjustly enriched. *Id.* at ¶ 30. The parties briefed this motion as well as a motion filed by the Bakery to defer ruling on summary judgment until further discovery was taken. *Id.* at ¶¶ 31-32. On December 18, 2017, the Court denied the motion to defer. *Id.* at ¶ 33.

At the Court's request, the parties initiated discovery on the Bakery's breach of contract claim. *Id.* at ¶¶ 34-42. Initially, the parties had disputes as to the scope of discovery, namely whether it should be confined to the Bakery's individual claim or open as to the claims of the putative class members. *Id.* at ¶¶ 35-37. Worldpay contended that the written notice of dispute served by the Bakery in accordance with the terms did not satisfy the putative class members' obligations to serve their own written disputes and as a result the class claims could not possibly succeed. *Id.* The

parties briefed this issue and ultimately the Court indicated "that a named plaintiff's notice can be sufficient in terms of the rest of the class members who are properly in the same situation." *See* Dkt. 43 in Case No. 16-cv-3627-MLB.

Worldpay sought and obtained clarification from the Court that this ruling was not on the merits but was only made in the context of allowing class discovery to proceed. Joint Decl. ¶¶ 40-41. Class discovery opened on February 21, 2018. *Id.* at ¶ 42. Each party served multiple sets of written discovery, about which the parties met and conferred on several occasions. *Id.* at ¶¶ 42, 44. The parties also negotiated detailed protocols governing preservation, ESI, discovery procedures, and confidentiality. *Id.* at ¶ 43. The written discovery was responded to, a third party subpoena was served, and roughly 4,000 pages of documents were produced and analyzed. *Id.* at ¶¶ 42-44.

During discovery, it became clear that the claims of Plaintiffs Acebedo, IDL Quad, and MLC were not dependent on the outcome of Defendant's summary judgment motion as to the Bakery. *Id.* at ¶ 45. Some merchants were subject to older, materially different versions of the contract (a/k/a "old paper") that did not include the terms at issue on summary judgment while others had been subjected to fee practices that were not at issue in the Bakery's case. *Id.*

As a result, these Plaintiffs terminated the tolling agreement and filed a new case against Worldpay which also pled claims for breach of contract and unjust enrichment and added a claim for fraudulent inducement (i.e., the *Acebedo* action). *See* Dkt. 1 in Case No. 18-cv-2688-MLB. The parties met and conferred and agreed to coordinate discovery in the two actions. Joint Decl. ¶ 48.

On July 13, 2018, Worldpay moved to dismiss the fraudulent inducement claim and the parties fully briefed the motion. *Id.* at ¶¶ 49-50. In the meantime, the parties continued with discovery and Worldpay produced an additional 45,000 pages of ESI, which class counsel reviewed and coded. *Id.* at ¶ 51. In September 2018, the parties had discussions concerning the nature and scope of a mediation, including information Plaintiffs' expert needed to estimate class-wide damages. *Id.* at ¶ 52.

On October 16, 2018, the Court granted Worldpay's motion for partial summary judgment against the Bakery. *See* Dkt. 63 in Case No. 16-cv-3627-MLB. The Court found that the version of the contract terms applicable to the Bakery (i.e., "new paper") was enforceable and the unjust enrichment claim failed due to the existence of an enforceable contract. *Id.* Two days later, the parties moved to stay the cases pending mediation and such request was granted. Joint Decl. ¶¶ 53-54.

The parties retained experienced class action neutral Hunter Hughes, III to mediate the case. *Id.* at ¶ 55. Over the next several months Worldpay produced

voluminous data to Plaintiffs and their renowned data expert, Arthur Olsen of Cassis Technology, LLC, including but not limited to lists of all small business (a/k/a ISO and SBU) customers, the contracts, statements, raw fee data for a statistically significant sample of current and former customers, and aggregate revenue figures earned by Worldpay for the class period. *Id.* at ¶¶ 56-62. More than 6,000 pages of contract and statement documents were ultimately produced, as well as massive spreadsheets containing hundreds of thousands of lines of billing data. *Id.* at ¶¶ 57, 60.

Mr. Olsen organized the data, wrote code to extract overcharges relating to the fees at issue, and created demonstrative exhibits detailing his findings for use at the mediation, which were provided to Worldpay and Mr. Hughes. *Id.* at ¶ 63. The parties also exchanged voluminous mediation statements. *Id.* at ¶¶ 64-65. A full day of mediation occurred on April 26, 2019. *Id.* at ¶ 66. Negotiations were fiercely contested and there was profound disagreement on class certification and merits-based issues as well as certain damage assumptions made by Mr. Olsen. *Id.*; *also* Declaration of Hunter Hughes ("Hughes Decl.") ¶ 8 (Exh. A hereto). However, there was enough common ground that the parties agreed to continue negotiations after Worldpay provided additional data. Hughes Decl. ¶ 8; Joint Decl. ¶¶ 66-68. Spreadsheets with many thousands of additional lines of fee data were produced, "crunched" by the

parties' experts, and revised damage estimates and supplemental mediation briefs were exchanged.  Joint Decl. ¶¶ 69-71.

The parties continued to negotiate through Mr. Hughes and ultimately executed an MOU summarizing a class settlement.  *Id.* at ¶¶ 73-74.  The negotiations were at arm's length and often difficult and the parties utilized Mr. Hughes' services to bridge particularly challenging issues.  *Id.* at ¶ 74.

The parties thereafter worked to finalize the precise terms of the settlement. Joint Decl. ¶ 76.  Class counsel prepared an initial draft of the agreement and over the next few months, the parties exchanged multiple redlined drafts.  *Id.*  The parties also exchanged multiple drafts of the class notices and the allocation formula, to ensure the class members were provided fair notice and the settlement payments were fairly divided in a logistically feasible manner.  *Id.* at ¶ 77.

After consensus was reached on the final terms and a settlement administrator was selected following a competitive bid process, the parties signed the agreement and Plaintiffs and class counsel filed an unopposed motion for preliminary approval and to direct notice.  *See* Dkt. 77 in Case No. 16-cv-3627-MLB; Dkt. 28 in Case No. 18-cv-2688-MLB.  On January 10, 2020, following a hearing, the motion was granted by the Court.  *See* Preliminary Approval Order.

**B.**    **Terms of Settlement.**    The settlement's terms are detailed in the agreement.  *See* Dkt. 77-1 in Case No. 16-cv-3627-MLB; Dkt. 28-1 in Case No. 18-cv-2688-MLB.  The following is a summary of the material terms:

1.    Settlement Class:    The settlement class – an opt-out class under Rule 23(b)(3) – is defined as:

> All ISO and SBU merchants that entered into a payment card processing service contract with Defendant Worldpay US, Inc. and paid one or more of the Subject Fees between August 26, 2010, and the date of preliminary approval.[2]

Settlement ¶ 41.  Several types of entities enumerated in the settlement are excluded from the class, most notably those owned by or affiliated with Worldpay.  *Id.*

2.    The Relief:  The relief to settlement class members includes:

***Settlement Fund*** – Defendant has paid $15 million into an escrow account that will be used to pay cash benefits to class members, notice and administration costs, legal fees and expenses, service awards to the class representatives, and any necessary taxes.  Settlement ¶ 42.  The 294,062 settlement class members will receive a cash payment if they file a simple claim form attesting that they contracted with Worldpay during the class period and provide their current contact information.  *See* Declaration of Jay Geraci ("Geraci Decl.") ¶ 8 (Exh. B hereto); Settlement ¶¶ 56, 66;

---

[2] The "Subject Fees" are listed in paragraph 40 of the agreement.

Claim Form (Exh. 3 to Settlement).

The amount of the cash payments is calculated as described in the allocation formula, a copy of which is attached as Exhibit 1 to the settlement. 60 percent of the net settlement fund (the amount remaining after payment of all other obligations) is allocated to settlement class members on "old paper" (i.e., the older, more merchant-friendly versions of the contract) and 40 percent is allocated to settlement class members on "new paper" (i.e., the newer, more Worldpay-friendly versions of the contract). These amounts will be split among both groups in the same manner, with (1) 20 percent being equally allocated, on a *per capita* basis, to each member, (2) 40 percent being allocated, *pro rata*, based on the total number of calendar months during which such member was a customer of Defendant during the class period, and (3) 40 percent being allocated, *pro rata*, based on the member's share of the total dollar volume of transactions processed through Defendant during the class period.

This allocation formula was chosen to account for the fact that some of the subject fees are service fees that are assessed periodically regardless of transaction volume, while others are dependent solely upon transaction volume. Joint Decl. ¶ 84. The allocation formula ensures that all class members will be fairly compensated relative to each other. *Id.* at ¶¶ 84-85.

If the total of the cash claimed by settlement class members, costs of notice and administration, attorneys' fees and expenses, service awards, and any taxes is less than $10 million, then the difference between the total of all of those amounts and $10 million will be distributed *pro rata* to settlement class members filing claims. Settlement ¶ 68.  If the total of all of those amounts is equal to or more than $10 million, any money remaining in the settlement fund after payment of all obligations will be returned to Defendant.  *Id.*

*Practice Changes* – In addition to funding the settlement, Defendant is bound to amend the terms and conditions applicable to current customers' contracts as follows:

a. Prior to increasing or adding any non-pass-through fees, Defendant will notify affected customers via statement message at least 30 days prior to the effective date of such increase or addition.

b. Any applicable early termination fee will be waived in the event of termination of the agreement by a customer within 60 days of an increase in (or new) non-pass-through fees *and* all statement messages advising of such fee increases must remind customers of this right.

c. Customers will be permitted to dispute fees on their statements within 60 days from receipt or availability of their statements.

d. The prevailing party in any dispute between customers and Defendant shall be entitled to recover their attorneys' fees.

Settlement ¶ 43.

In conjunction with the settlement, the class will release Worldpay from the claims that were or could have been raised.  *Id.* at ¶ 72.  Settlement class members

specifically retain all rights to challenge invoices sent by Defendant after preliminary approval. *Id.* In turn, Worldpay will release settlement class members from any potential liability for payment of Defendant's attorneys' fees and expenses. *Id.* at 73. The releases are more fully described in Section XII of the Settlement.

      **C.**   **The Notice Program.** The notice program was designed to provide the best notice practicable, and was tailored to take advantage of the contact information Worldpay had available about the settlement class members. Settlement ¶¶ 52-59. Each facet of the notice program was timely and properly accomplished. Geraci Decl. ¶¶ 10-19. Defendant forwarded the settlement administrator the names and contact information for all members of the settlement class. *Id.* at ¶ 8. Notice of the settlement was sent to class members by email and postcard notice with attached claim forms were sent to those members whose email addresses were unavailable or unusable. Reasonable efforts were made to update all addresses. *Id.* at ¶¶ 9-16.

      Since February 21, 2020, a long form notice, relevant pleadings, and other information about the settlement has been available on the settlement website and class members have been able to call a toll-free number. The settlement website also enables settlement class members to submit claims online. *Id.* at ¶¶ 17-19. As of

April 24, 2020, the settlement website had 44,655 visits and the telephone number had handled 956 calls. *Id.*

The success rate for the individual notice program has been high. To date, individual notice has reached 95 percent of settlement class members, *id.* at ¶¶ 15-16, and efforts to resend notices to those whose previous notice was returned as undeliverable are ongoing. *Id.* This reach exceeds the threshold recommended by the Federal Judicial Center and approved by many courts in connection with other class action settlements. *E.g.*, https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

As of April 24, 2020, the settlement administrator had received only three requests for exclusion (opt-outs). *Id.* at ¶ 21. Moreover, to date *zero* objections to the settlement have been received. *Id.* at ¶ 23; *also* Supplemental Joint Declaration of E. Adam Webb and Matthew C. Klase ("Supp. Joint Decl.") ¶ 20 (Exh. C hereto).

To date, the claims process has also been successful. As of April 24, 2020, 24,714 class members had submitted valid claims, a "to-date" claim percentage of 8.4%. Geraci Decl. ¶ 20. The claims rate will climb until the deadline of July 8, 2020. *Id.*

## ARGUMENT AND CITATION OF AUTHORITY

Court approval is required for settlement of a class action. Fed. R. Civ. P. 23(e). Courts have long recognized "the strong judicial policy favoring [class] settlement as

well as by the realization that compromise is the essence of settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *see also Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *Meyer v. Citizens and Southern Bank*, 677 F. Supp. 1196, 1200 (M.D. Ga. 1988). Indeed, "[s]ettlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process and are highly favored by the law." *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000). The Court has broad discretion in approving a settlement. *Id.* As explained herein, the Settlement here provides excellent, automatic benefits to the Settlement Class and is more than sufficient under Rule 23(e). Final approval is warranted.

A. **The Court Has Personal Jurisdiction Over the Settlement Class.**

In addition to having personal jurisdiction over Plaintiffs, the Court also has personal jurisdiction over all members of the settlement class because they received the requisite notice and due process. *See Phillips Petro. Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)). The Court-approved individual notice program, supplemented by the settlement website and telephone line, more than satisfies due process requirements. *Shutts*, 472 U.S. at 812; Preliminary Approval Order, ¶ 11. Indeed, not only did the notice inform the settlement class members about the

scope of the settlement, their rights under the settlement, and where they could find more information, but it also informed them of class counsel's intention to seek fees of up to one-third of the settlement fund as well as $10,000 service awards for each of the Plaintiffs. Hence, the notice was "reasonably calculated, under [the] circumstances, to apprise interested Parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812.

Moreover, in terms of timing, the settlement class members had 77 days between the initial emailing of the notice and 62 days between the initial mailing of the postcard notice, and the deadline to request exclusion from the class, which is May 11, 2020. *Silber v. Mabon*, 18 F.3d 1449, 1452, 1454 (9th Cir. 1994) (due process requirement and Rule 23 satisfied when settlement notices were sent out 40 days before the opt-out deadline). The notice program, as implemented, clearly met constitutional and Rule 23(e) due process requirements. As a result, the Court should affirm in its final approval order that the settlement class was provided the best notice practicable under the circumstances.

**B.    The Settlement Is Fair, Adequate, and Reasonable.** Federal Rule 23(e) indicates settlements should be approved if they are "fair, adequate, and reasonable." Over the years, the various circuits developed their own criteria for assessing whether a class settlement met this standard. The Eleventh Circuit, for

instance, identified six key points of analysis, known as the "*Bennett* factors." *Leverso v. Southtrust Bank*, 18 F.3d 1527, 1530 (11th Cir. 1994); *also Bennett*, 737 F.2d at 986.  These six factors are:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Leverso*, 18 F.3d at 1530.

In an effort to unify the criteria considered by the various circuits, Congress recently amended Rule 23(e) to specifically articulate the applicable criteria.  The amended Rule 23(e)(2) took effect on December 1, 2018, and states that courts may approve a proposed settlement as "fair, reasonable, and adequate" only after a hearing and after considering whether:

> (A)    the class representatives and class counsel have adequately represented the class;
>
> (B)    the proposal was negotiated at arm's length;
>
> (C)    the relief provided for the class is adequate, taking into account:
>
> > (i)    the costs, risks, and delay of trial and appeal;
> >
> > (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

   (iv) any agreement required to be identified under Rule 23(e)(3); and

  (D) the proposal treats class members equitably relative to each other.

An analysis of these criteria, which are substantively similar to the Eleventh Circuit's *Bennett* factors, show this settlement to be eminently fair, reasonable, and adequate.

  1. <u>The Settlement Class Has Received Outstanding Representation:</u>  The record shows that class counsel and the class representatives have provided excellent representation to the settlement class.  Class counsel conducted an extensive factual investigation before filing the case; obtained a huge amount of class and merits discovery from Defendant; obtained voluminous information to enable a qualified data expert to accurately estimate class damages; retained such an expert to calculate damages; and briefed various legal issues in Court and during the mediation process on both merits and class certification issues.  Joint Decl. ¶¶ 8-71; Firm Résumé (Exh. 1 to Joint Decl.); Supp. Joint Decl. ¶ 2.

  Class counsel's extensive knowledge, investigation, discovery, and briefing allowed them to better understand the merits of these action and damages of the settlement class, prepared them for the mediation, and successfully positioned them to engage in vigorous, arms-length negotiations under the direction of Mr.

Hughes, who fully explored the issues in the case and helped the parties reach the proposed settlement.  Supp. Joint Decl. ¶ 3; Hughes Decl. ¶ 8.

In light of the foregoing, the settlement constitutes an informed, educated, and fair resolution of this dispute.  Extensive information allowed class counsel and the class representatives to assess their position in great detail and make a reasonable decision on settlement, which is all that is required.  *E.g.*, *Champs Sports Bar & Grill Co. v. Mercury Payment Sys., LLC*, 275 F. Supp. 3d 1350, 1354 (N.D. Ga. 2017) (approving class settlement that was settled under similar circumstances); *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 669 (M.D. Ala. 1988) (settlement appropriate given counsel acquired sufficient information "to determine the probability of . . . success on the merits, the possible range of recovery, and the likely expense and duration of the litigation").

2.     <u>The Settlement Was Negotiated at Arm's Length:</u>   The settlement resulted from hard-fought, informed, protracted negotiations by experienced attorneys with the active assistance of a well-respected and highly experienced mediator.  Joint Decl. ¶¶ 54-74; Hughes Decl. ¶ 8.  Counsel zealously represented their clients throughout the case.  The settlement did not result from fraud or collusion.  *E.g.*, *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 661 (S.D. Fla. 2011) ("Settlement negotiations that involve arm's length, informed

bargaining with the aid of experienced counsel support a preliminary finding of fairness"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of … a highly experienced mediator lends further support to the absence of collusion").

3. <u>The Substantial Relief Provided Is Admirable Given the Risks:</u> "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigations." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 543 (S.D. Fla. 1988). A settlement thus merits approval if it "will alleviate the need for judicial exploration of . . . complex subjects, reduce litigation costs, and eliminate the significant risk that individual claimants might recover nothing." *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005). Such is the case here. Indeed, if not settled, this case inevitably will result in substantial additional expenditure of time and money by the parties and the Court, as would be true of any case involving complex facts and a class of 294,062 members. The Court would be required to rule on the pending motion to dismiss and the parties would move forward with additional intense fact and expert discovery and briefing on class certification, additional summary judgment motions, and *Daubert* challenges, followed by a lengthy trial and (potentially) appeals. Joint Decl. ¶ 87. The enormous costs to the parties and the court system of such

proceedings are obvious and cannot be overlooked.

Because many of the most controversial and hard-fought of all the issues in this case remain to be litigated, the settlement "eliminates the transaction costs that further proceedings would impose," "provides relief for the class sooner than continued litigation would," and "avoids the risks and burdens of potentially protracted litigation." *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004).

Settlement is an appropriate outcome where the likelihood of success is difficult to assess and the plaintiffs face substantial challenges. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). Such is the case here. Indeed, the settlement represents a compromise that balances the merits of Plaintiffs' claims with the considerable difficulties of proving their claims. The class representatives and class counsel believe that they could succeed on their claims at trial. Joint Decl. ¶ 88. However, the risks involved cannot be disregarded. For instance, with respect to settlement class members on "new paper," the Court has already found that the Worldpay-favorable contract terms were enforceable. These terms substantially reduce such class members' prospects of prevailing on the merits. Moreover, if the Court decided that the written notices served by the named Plaintiffs were insufficient for the other class members on "new paper," their breach claims would likely be lost. Likewise, Worldpay's motion to dismiss the fraudulent inducement claim was

19

pending and, if granted, would have ended that claim. Worldpay also asserted a defense of voluntary payment. Defendant was also expected to vigorously contest certification of the class, arguing that the propriety of the practices at issue are highly individualized and fact-specific inquiries. *Id.*

The proposed settlement avoids these uncertainties and provides the settlement class with immediate, meaningful, and certain monetary and equitable relief. *Id.* Under the circumstances, Plaintiffs and class counsel appropriately determined that the settlement outweighs the risks of continued litigation. *Id.* at ¶ 89.

Here, the settlement falls within the range of reason. The amount of the settlement recovered for "old paper" merchants (i.e., $9 million) represents approximately 38 percent of their most likely recoverable trial damages and 160 percent of Worldpay's estimate of their damages. *Id.* at ¶¶ 91-92. The amount of the settlement recovered for "new paper" merchants (i.e., $6 million) represents a lesser percentage of recoverable trial damages given the rulings made by the Court to date and the strength of Defendant's remaining defenses. *Id.* at ¶¶ 91, 93. Based on the allocation formula, settlement class members will receive various amounts and some payments will be sizable. *Id.* at ¶ 94. Class members that remain customers of Worldpay will also receive non-monetary benefits in the form of important contract changes that give them more opportunity to address fee increases, preserve their right

to challenge fee errors and discrepancies, and even the playing field in future fee disputes. Joint Decl. ¶ 95; Settlement ¶ 43. The substantial value of such relief to many in the settlement class cannot be overlooked.

These benefits compare favorably with class settlements approved in other cases. *See, e.g., Mercury Payment*, 275 F. Supp. 3d at 1354 (payment processing settlement recovering 25-50% of damages approved by Judge Cohen)[3]; *Lipuma*, 406 F. Supp. 2d at 1323 (approving settlement that provided less than ten percent of potential recovery); *Behrens*, 118 F.R.D. at 542 (settlement for six percent of damages approved and noting "fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean [it] is unfair or inadequate").

Additionally, to make it as easy as possible on class members to receive their payments, the parties designed a very simple claim form that is extremely easy to complete and provided multiple options for submission – U.S. Mail and electronic submission through the settlement website. Settlement ¶ 56; Supp. Joint Decl. ¶ 19. The experienced settlement administrator will have no trouble processing these simple claim forms. Geraci Decl. ¶ 20. Claims will only be rejected if they are submitted by non-settlement class members or are untimely. *Id.*

---

[3] Class counsel served as one of four lead firms for the class in *Mercury Payment* and believe the claims in that case were stronger than the claims of many class members in this matter. Joint Decl. ¶ 96.

Subject to approval by the Court, the settlement calls for class counsel to receive one-third of the settlement fund and an expense reimbursement, and the class representatives to receive a service award of $10,000 each. Settlement ¶¶ 77, 79. The parties did not negotiate these amounts until after the key provisions of the settlement, including the direct relief to the class, was agreed upon. Joint Decl. ¶ 79; Hughes Decl. ¶ 9. These amounts are reasonable. *See* Motion for Attorneys' Fees, Expenses, and Service Awards (filed concurrently herewith).

The parties have no agreements in connection with the settlement other than those specifically articulated in the agreement. Joint Decl. ¶ 102.

By any reasonable measure, the settlement is a significant achievement given the extraordinary obstacles that Plaintiffs and the settlement class faced.

4.    The Settlement Treats Class Members Equitably:    All class members have the same opportunity to receive a payment from the settlement fund pursuant to an allocation formula that was designed to ensure that settlement class members on "old paper" and those on "new paper" will be fairly compensated relative to each other. Joint Decl. ¶¶ 77, 91. All class members have been treated equitably.

5.    The Opinions of Class Counsel, the Class Representatives, and Absent Class Members Support the Settlement:    The Advisory Committee Note to the amended Rule 23(e) provides that courts may continue to consider factors previously

22

used to assess the fairness of a settlement in addition to those specifically enumerated.    As a result, the Court should give "great weight to the recommendations of counsel for the Parties, given their considerable experience in this type of litigation." *Warren v. City of Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988); *see also In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993) ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the Parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel'") (citations omitted).

Class counsel whole-heartedly recommend the settlement as an excellent result.  Supp. Joint Decl. ¶ 25.  Indeed, class counsel endorse the settlement as fair, reasonable, and adequate based upon (i) their experience litigating other class actions, including those involving similar allegations as to other payment processors, such as *Mercury Payment*; (ii) their hands-on involvement in this litigation; (iii) their knowledge of the extensive formal and mediation discovery that they reviewed and analyzed; (iv) the opinions and guidance they received from their expert; and (v) their participation in arms-length and adversarial negotiations under the supervision of Mr. Hughes.  Joint Decl. ¶ 98.

The four named Plaintiffs also uniformly agree that the settlement is a fair, adequate, and reasonable compromise.  Joint Decl. ¶ 99.

Moreover, every indication is that collectively the absent settlement class members also support the settlement.  While the objection and opt out deadline is still almost two weeks away, to date no class member has objected and only three have opted out.  Geraci Decl. ¶¶ 21, 23.  Considering that the settlement class comprises 294,062 members, this response is overwhelmingly favorable, strengthening the argument that the settlement should be approved.  Indeed, it is settled that "[a] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness."  *Association for Disabled Americans v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002).

Similarly, as of April 24, 2020, 24,714 class members (approximately 8.4 percent of the class) have already filed valid claims.  This response rate provides even more evidence the class approves the settlement.  Indeed, this claims rate already exceeds that for the entire claims period in most other settlements.  *E.g., Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 5449813, *22 (S.D. Fla. Sept. 14, 2015), *appeal dismissed*, 2016 WL 3896231, *1 (11th Cir. May 23, 2016) (noting that typical approved claims-made settlements have claims rates that "rarely" exceed 7 percent, "even with the most extensive notice campaigns") (citation omitted); *In re*

*Pool Products Distribution Market Antitrust Litig.*, 2016 WL 235781, *6 (E.D. La. Jan. 20, 2016) (approving settlement with 5% claims rate). Undoubtedly many more class members will file claims before the July 8th deadline. Supp. Joint Decl. ¶ 21.

All of the new Rule 23(e)(2) factors, as well as the Eleventh Circuit's *Bennett* factors, support a finding that the settlement is fair, reasonable, and adequate.

**C.    The Court Should Certify the Settlement Class.** This Court has previously found that the settlement class is adequately defined and clearly ascertainable and satisfies all requirements of Rule 23(a) and 23(b)(3) for settlement purposes. *See* Preliminary Approval Order ¶¶ 3-5; *also* Motion for Preliminary Approval, pp. 21-24. Nothing has changed regarding the application of the factors to this case since the preliminary approval order was entered. For the reasons already considered by the Court, Plaintiffs request that the Court confirm its preliminary decision and finally certify the settlement class. *E.g.*, *Mercury Payment*, 275 F. Supp. 3d at 1355.

## CONCLUSION

Based on the foregoing, Plaintiffs and class counsel respectfully request that the Court find that the notice program, as implemented, meets the requirements of due process and Rule 23, finally approve the settlement, and certify the settlement class. Plaintiffs will submit a proposed order for the Court's consideration.

25

DATED this 27th day of April, 2020.

Respectfully submitted,

BY:  WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb
  Georgia Bar No. 743910
Matthew C. Klase
  Georgia Bar No. 141903

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com
Matt@WebbLLC.com

Attorneys for Plaintiffs and
the Settlement Class

26

## TYPE AND FONT CERTIFICATION

The undersigned certifies that this brief complies with Local Rule 5.1(B) regarding typefaces and fonts.

*/s/ E. Adam Webb*
E. Adam Webb

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of April, 2020, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ E. Adam Webb*
E. Adam Webb